378 So.2d 369 (1979)
DeNoux and Stephen Reboul. Sheryl CHEATHAM, wife of Charles Cheatham, Individually and on behalf on her minor son, Charles Cheatham, Jr.
v.
CITY OF NEW ORLEANS, Daniel Denoux and Stephen Reboul.
No. 64442.
Supreme Court of Louisiana.
November 1, 1979.
Rehearing Denied January 11, 1980.
*370 Louis B. Merhige, Wayne G. Cresap, New Orleans, for defendant-respondent.
Mack E. Barham, Barham & Churchill, David J. Dennis, Ernest L. Jones, Cotton, Jones & Dennis, New Orleans, for plaintiff-applicant.
Donald A. Hoffman, City Atty., Debra J. Fischman, Asst. City Atty., for defendant-respondent, City of New Orleans.
CALOGERO, Justice.
Charles Cheatham's widow filed a wrongful death action on behalf of herself and her two and one-half year old son, against the City of New Orleans and two New Orleans police officers, Daniel DeNoux and Stephen Reboul. There was a single bifurcated trial, the claim against the two officers being decided by a jury and the claim against the City being decided by the trial judge.[1] The jury found that the two officers acted negligently, causing the wrongful death of Charles Cheatham, and that Mr. Cheatham had not been contributorily negligent. They awarded Mrs. Cheatham a total of $529,000 in damages and the minor child a total of $125,000, against the officers. The judge held that the City of New Orleans was also liable since the officers were acting within the course and scope of their employment in connection with the incident. He cast the City in solido with the two officers for damages in the same sums as had the jury. Defendants appealed. The Court of Appeal reversed in part, holding only one officer liable (Daniel DeNoux), exonerating the City and the other officer (Stephen Reboul), and substantially reducing plaintiffs' recovery. We granted writs upon the application of plaintiffs to consider whether the Court of Appeal erred in exonerating one of the officers and the City, and in reducing plaintiffs' damage awards.
The facts and certain of the testimony are essentially as follows:
*371 About midnight, April 11, 1975, Officers DeNoux and Reboul, off-duty and in plain clothes on this occasion, were with their friend, Richard Schilling, walking down Bourbon Street, each carrying a drink. As they neared Toulouse Street, they were approached by a young shoe-shine boy, who with some persistence, tried to persuade them to have their shoes shined. The officers became irritated and a verbal altercation ensued. Becoming even more irritated by the boy's responses Officer Reboul began to manhandle him. The shoe-shine boy, Flem Ballett, testified that Charles Cheatham, an adult male unrelated to the principals in the altercation, then came upon the scene and intervened on the youth's behalf. Ballett further testified that it was one of the officers who threw the first punch; that both officers were punching and kicking Cheatham; one officer stepped back and the other officer and Cheatham fell to the ground; as Cheatham started to get up off the ground, the officer who had stepped back shot him. Ballett testified that Cheatham did not have a gun in his possession at any time during the fight.
Joseph Baker is a cab driver who came over to the scene when he saw the grown men manhandling the boy. He testified that he and Cheatham came up at about the same time. The men did not identify themselves as police officers and forcefully told them both to move on as the affair was none of their business. At this time Cheatham responded that he was going to make it his business. Baker further testified that at that time one of the defendants asked the other to hold his drink for him and then reached out and struck Cheatham, thereby starting the fight. Baker did not see who fired the shot because he had turned around to get the keys out of his cab. Baker did testify that when he turned back around, upon hearing the gunshot, he saw Officer Reboul standing there with a gun in one hand and his identification in the other saying he was a policeman and for everyone to stay back.
Two other witnesses, Douglas Gaspard and Alfred Smith, basically confirmed the story above, that the officer threw the first blow and that the men did not identify themselves as officers. But these two witnesses identified Reboul as the person who pulled his gun and shot Cheatham.
Defendants Reboul and DeNoux gave a different account of what happened. They testified that they were instructing the shoe-shine boy to be on his way and to stop annoying them, when Cheatham came forward and began verbally abusing the officers in an obscene manner. They both testified that they there and then identified themselves as policemen, but that Cheatham continued to abuse them. When they threatened to arrest Cheatham, he turned as if he were leaving, but suddenly turned back, swung and struck Officer Reboul in the face. Then the fight ensued, with Reboul and Cheatham rolling on the ground. The officers further stated that during the scuffle, Cheatham came up with the gun which Reboul had been carrying and pointed it at Reboul's head. DeNoux then drew his gun, pointed it at Cheatham and instructed him to drop the gun. At this time, the officers testified, Cheatham suddenly swung the gun around and pointed it at DeNoux, at which time DeNoux shot Cheatham.
Defendants sought to corroborate their version of the episode by introduction of statements from two witnesses obtained in the police homicide investigation. The statements were admitted over defense objection. One of these witnesses had been found dead shortly after the shooting, and the other took the stand and repudiated the story that he had earlier given the investigator. Both of these witnesses had long criminal records which included convictions for felonies.
Unobjected to hearsay was admitted to the effect that ballistics tests established it was DeNoux's pistol that fired the bullet which was taken from Cheatham's body.
Richard Schilling, the officers' friend and companion on the night of the incident, an off-duty Jefferson Parish deputy sheriff also in plain clothes, testified that he could not say who did the shooting because he *372 had his back turned from the fight and was not watching at that time.
Shortly after the shooting, the deceased was taken to the hospital where he remained alive for a couple of hours before he died. There were surgical attempts to save Cheatham's life, all to no avail. Cheatham apparently lost consciousness a few minutes after the shooting and never regained it.
In connection with the wrongful death and survival actions plaintiffs filed against DeNoux, Reboul and the City of New Orleans, all three defendants were represented by the office of the City Attorney, more particularly an assistant city attorney. It was his theory and that of his clients that Cheatham had been contributorily negligent in resisting a lawful arrest by the two New Orleans police officers.
The jury found that: (1) DeNoux and Reboul had been negligent; (2) their actions were the proximate cause of the death of Cheatham; and (3) Cheatham had not been contributorily negligent. The jury awarded $529,000 to Mrs. Cheatham, and $125,000 to Mrs. Cheatham as administrator for her son.
The trial judge imposed the same quantum by casting the City solidarily with DeNoux and Reboul since the latter were acting within the course and scope of their employment at the time of the shooting. Defendants' motion for a new trial, or alternatively for a reduction in damages, were denied by the trial judge.
DeNoux, Reboul and the City of New Orleans, still simultaneously represented by the City Attorney's office, appealed to the Fourth Circuit Court of Appeal reurging their lack of negligence and their defense of Cheatham's asserted contributory negligence (and of course, a plea for quantum reduction). On appeal, just as in the trial court, defendants (in particular the City) did not contend the police were not in the course and scope of their employment in connection with the incident. It was the Court of Appeal which suggested that the issue, course and scope, was a relevant one. Effectively the appeals court asserted an unpleaded defense for the City. The Court requested supplemental briefs on that issue. It was only at that time that the defendants employed separate attorneys and filed briefs on the issue of course and scope of employment.[2] The City contended, of course, that the men were not in the course and scope of their employment in connection with the incident.
The Court of Appeal reversed in part the decision of the trial court. They held only DeNoux liable, relieving of liability both Reboul and the City. The Court reasoned that Reboul, although perhaps instigating the fight, did not perform an act which he could reasonably have foreseen would lead to a shooting, and that DeNoux, the officer they concluded shot Cheatham, was not acting in the course and scope of his employment at the time of the incident. In addition, the Court reduced the damages awarded by the jury. The Court of Appeal did affirm that part of the trial court judgment which found that DeNoux negligently caused the death of Cheatham and that Cheatham was not contributorily negligent.
This Court granted writs upon application of the plaintiffs to consider whether the Court of Appeal erred in reversing the trial court judgment in part and in reducing the awards.[3] The issues presented are: (1) whether the Court of Appeal erred in holding that Reboul was not liable for the wrongful death of Cheatham; (2) whether the Court of Appeal erred in considering an issue not raised by the parties and in holding that the officer and/or officers were not acting within the course and scope of their employment at the time of the shooting; and (3) whether the Court of Appeal *373 erred in reducing the damages awarded by the jury.[4] We will consider each issue separately and in the order set forth above.
The first issue concerns the liability of Reboul (the officer who the Court of Appeal concluded did not do the shooting). In the propounded interrogatories the jury was only asked if Reboul was guilty of negligence which proximately caused the death of Cheatham. The jury's answer was "yes".[5] In looking at the jury charges, it is clear that all the jury determined was that Reboul did an act which a reasonable man, under the circumstances, would not have done, or that he failed to do an act which a reasonable man would have done, and that this act or failure to act was a cause of the death of Charles Cheatham.
It is not clear whether the jury found Reboul liable because he shot Cheatham or because of other negligence on his part.
The Court of Appeal concluded that Reboul did not shoot Cheatham, rather DeNoux did, and that Reboul's negligence was not a cause of Cheatham's death because "the fatal wounding of Cheatham by DeNoux falls outside of that degree of reasonable foreseeability ascribable to Reboul as he scuffled with Cheatham."
As we have frequently stated, a reviewing court is not to make its own factual determinations unless it finds, looking at the record as a whole, that the findings of the trier of facts are clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring, 283 So.2d 716 (La.1973). In this case, the triers of fact, the jury and judge, simply found that Reboul committed an act which a reasonably prudent man would not have committed (or failed to do an act which a reasonably prudent man would have done) and but for that act Cheatham would not have been shot. This conclusion is supported by the evidence in the record and is not clearly wrong.
First of all, there is at least sufficient evidence in the record to support a conclusion that Reboul did the shooting, such that a trial determination to that effect would not have been clearly wrong. Although there was admittedly the contrary evidence in the form of the testimony of Reboul and DeNoux and in the nature of unobjected to hearsay, there were other witnesses who testified that Reboul shot Cheatham.
Furthermore, even if Reboul did not shoot Cheatham and the jury so concluded, it was nonetheless within the jury's province to find, and we cannot say that they were clearly wrong in this, that Reboul was otherwise negligent and that his negligence was a proximate cause of Cheatham's death.
Cheatham was a larger man than either Reboul or DeNoux. Reboul was aware that his partner was carrying a gun and it was police regulation for him to do so. He should readily have foreseen that if he did engage in a fight with Cheatham, and should the fight not go as he hoped it would, that his partner, DeNoux, would do what was necessary to protect him. He also knew or should have known that his partner DeNoux had been cited before for excessive force. Reboul therefore at least knew that the potential for excess existed. We conclude that when Reboul entered into the fight with Cheatham it was foreseeable, indeed expected, that his partner would intervene *374 on his behalf if it became necessary, and that his partner, having in his possession a gun, might use that gun if he thought it was necessary to protect his partner. Therefore, in fighting with Cheatham, not identifying himself as a police officer (which the jury must have found since they did not find that Cheatham was contributorily negligent) and knowing the habits of his partner, it was not clearly wrong for the jury to have determined, if they did, that Reboul acted negligently, contributing to the cause of Cheatham's death.
Thus, on the issue of whether Reboul is also liable for the wrongful death of Charles Cheatham, we conclude that he is, irrespective of whether he did or did not do the shooting.
The next issue we must consider is whether the Court of Appeal erred in considering an issue not raised by the parties, and holding that the officer and/or officers were not acting within the course and scope of their employment at the time of the incident. The Court of Appeal reversed the trial court's judgment that DeNoux and Reboul had been acting as police officers when Cheatham was killed and that the City of New Orleans therefore was responsible for his death under Civil Code Article 2320 (respondeat superior). To reach this result, the Court ignored clear and direct admissions in the defendant's answer and the defense posture of the City throughout the trial and initially on appeal, as well as abundant evidence to the contrary.
From the commencement of this litigation, the three defendants, Officers Reboul and DeNoux and the City of New Orleans, were represented by identical counsel, an assistant city attorney. Such singular representations would have been strictly prohibited by the Louisiana Code of Professional Responsibility[6] if the clients had been urging contrary positions in this litigation, e. g., if the officers, to avoid exclusive responsibility, were urging that their conduct was in the course and scope of employment, and the City, to avoid liability, was urging that it was not. But the facts show there was never any suggestion on the part of any of the defendants that the two policemen were not acting within the course and scope of their employment when Cheatham was shot. The three defendants defended their lawsuit as a team on the theory that Charles Cheatham had been at least contributorily negligent in resisting a lawful arrest by New Orleans police officers.
There was more, however, than the foregoing implicit admission that Reboul and DeNoux were acting in the course and scope of their employment with the city.
Paragraph XXXI of the defendants' answer reads in pertinent part as follows:
"Defendants further state in answering that the alleged accident sued upon and the alleged resulting injuries, damages and expenses were caused entirely and solely by his contributory negligence by participating in an aggravated assault and battery upon the defendants and in failing to submit peaceably to a lawful arrest and to the lawful orders of the law enforcement officers of the Parish of Orleans, and all other acts and conduct, all of which are more particularly within the knowledge of plaintiff, and which will be demonstrated at the trial of this matter, which actions are a bar to plaintiffs' recovery." (emphasis added)
Louisiana Civil Code Article 2291 provides as follows:
"The judicial confession is the declaration which the party, or his special attorney in fact, makes in a judicial proceeding.
It amounts to full proof against him who has made it.
It can not be divided against him.
It can not be revoked, unless it be proved to have been made through an error in fact.
It can not be revoked on a pretense of an error in law."
The jurisprudence interpreting this statute is well settled to the effect that an admission made in a pleading is within the *375 purview of this statute. It is also well settled that a judicial confession is a party's explicit admission of an adverse factual element and that it has the effect of waiving evidence as to the subject of the admission, of withdrawing the subject matter of the confession from issue. Crawford v. Deshotels, 359 So.2d 118 (La.1978); J. H. Jenkins Contractors, Inc. v. Farriel, 261 La. 374, 259 So.2d 882 (1972); Jackson v. Gulf Ins. Co., 250 La. 819, 199 So.2d 886 (1967); Farley v. Frost-Johnson Lumber Co., 133 La. 497, 63 So. 122 (1913); McCorkle v. Service Cab Co., 305 So.2d 589 (La.App. 4th Cir. 1974); Guilbeau v. Firemen's Fund Ins. Co., 293 So.2d 216 (La.App. 3d Cir. 1974). There is also jurisprudence to the effect that under La. Civ.Code art. 2291, once a party has made a judicial confession, and it has been relied on by the other party, the party making the admission may not take a contrary position later. Crawford v. Deshotels, supra; and McCorkle v. Service Cab Co., supra. The above has been held where the admission was made in the trial court and a contrary position was urged on appeal. McCorkle v. Service Cab Co., supra; and Faust v. Pelican Plumbing Supply, Inc., 215 So.2d 373 (La.App. 4th Cir. 1968).
Applying the codel article and the jurisprudence interpreting that article to the instant case, we conclude that the issue of whether the two officers were in the course and scope of their employment has been precluded by the defendants' own judicial confession that they were.
In addition to these allegations in the defendants' answer, both of the defendant officers, represented by the same attorney as the City, took the stand and testified under oath that they had acted in their capacity as police officers. Neither in the defendants' application for rehearing in the district court nor in their appeal did the defendants ever allege that the two police officers were other than within the course and scope of their employment. On appeal, all the defendants pled simply that the trial court had erred in finding the officers were negligent, and in not finding that the deceased was contributorily negligent in resisting a lawful arrest. It was not until the Court of Appeal requested supplemental briefs on the issue of course and scope that any of the defendants ever took the position that the officers were not acting within the course and scope of their employment at all times during the entire incident. Unfortunately for the City, by this time it was too late.
We therefore conclude that the several admissions made by defendants that the officers were acting within the course and scope of their employment at the time of the incident, and the plaintiffs' reliance on those admissions precluded the City from asserting a contrary position on appeal.[7]
Finally, we come to the issue of quantum. The judgment of the trial court, premised upon the jury's award as relates to defendants Reboul and DeNoux and the trial judge's award as relates to defendant City of New Orleans, awarded Mrs. Cheatham $529,000 and the child, Charles Cheatham, Jr. $125,000. These sums were, no doubt, based upon the jury's interrogatory answer to the following effect:
"To Sheryl Cheatham, widow of Charles Cheatham

*376
For the pain and suffering of her deceased
husband prior to his death $ 50,000
For loss of past earnings and for loss
of future earnings of her deceased
husband 279,000
For her mental pain and suffering
and for her loss of love and affection
both past and future 200,000
 ________
Total $529,000
To Charles Cheatham, Jr., minor son
of the deceased through his mother
as administrator:
For the loss of love and affection of
his deceased father and for any future
mental pain and suffering $125,000
 ---------

The Court of Appeal reduced these damages, awarded by the judge and jury, to a total of $170,000 for Mrs. Cheatham and $55,000 for Charles Cheatham, Jr.
The law on the issue of appellate review of damages is contained in La.Const. of 1974, art. V, § 10(B)[8] and La.Civ. Code art. 1934(3).[9] This Court has consistently held that Article 1934(3) does not violate the constitutional provisions of La.Const. of 1974, art. V, § 10. Revon v. American Guaranty and Liability Insurance Company, 296 So.2d 257 (La.1974). In interpreting Article 1934(3) this Court held in Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976):
"before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. ... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. ... It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." (citations omitted).
In the case at bar, the Court of Appeal decided that the trial court had abused its discretion in awarding damages and then proceeded to award what it thought was appropriate in looking at the evidence. In doing this the Court of Appeal exceeded its authority in reviewing damages. If, in fact, the jury did abuse its wide range of discretion, then the Court of Appeal is only allowed to reduce the award to the highest point which was reasonably within the jury's discretion. Coco v. Winston Industries, supra.
The jury awarded Mrs. Cheatham, in connection with the survival claim, $50,000 for the pain and suffering her husband underwent prior to his death. The Court of Appeal did not approve anything for that element of damages. They reasoned that there was no evidence introduced to prove that Cheatham ever regained consciousness after he was shot. Therefore, the court held that it was an abuse of discretion of the trial court to award plaintiff any sum of money for the pain and suffering of her husband prior to his death. While we agree that the award of damages of $50,000 was excessive, the reduction of that award to *377 nothing was not an acceptable or proper determination.
It is true that no evidence was presented which showed that the deceased regained consciousness from a point in time very shortly after he was shot. But that finding does not preclude an award for Mr. Cheatham's pain and suffering. The fight and the shooting undoubtedly caused plaintiff's husband to experience pain and suffering. He experienced pain from being beaten. He experienced embarrassment and humiliation from being a participant in a fight in a public place. This pain and embarrassment culminated in the intense pain of being shot through the lower chest with the bullet traveling through his abdomen. He lost consciousness only very shortly after the shooting and although he may not have regained consciousness to the apprehension of medical and other personnel, he remained alive for several hours, during which it is speculative to assume that he did not undergo mental trauma. Minimally, the deceased did experience some physical and mental pain, suffering, embarrassment and mental consternation, however short lived.
In accordance with our findings above, we believe that it was within the discretion of the jury to award plaintiff damages for her husband's pain and suffering in a range of from $5,000 to $15,000. Therefore, the $50,000 award of the jury should have been reduced only to $15,000, the highest point reasonably within the discretion of the jury. Coco v. Winston industries, Inc., supra. However, as we held in Davis v. Owen, 368 So.2d 1052 (La.1979), the survival damages should be shared equally by all members of the primary class of La.Civ. Code art. 2315 beneficiaries. Thus, of the $15,000 to be awarded for Charles Cheatham's pain and suffering, each of the two beneficiaries (Mrs. Cheatham and Charles Cheatham, Jr.) is entitled to one-half of the award, or $7,500.
With respect to damages awarded for loss of love and affection, as indicated the jury (and trial judge) awarded Mrs. Cheatham $200,000 and Charles Cheatham, Jr. $125,000. The Court of Appeal reduced these sums to $50,000 and $25,000 respectively. The court reasoned that because Mrs. Cheatham did not know the names of the classes her husband was taking in night school (she testified that he attended Southern University part time at night and went to school on Monday, Tuesday and Thursday nights and that he was taking business courses) and because he was on Bourbon Street at about midnight on a Friday night[10] the Cheathams were not a close family. This reasoning is somewhat specious at best. Furthermore, there was evidence from which the trial jury (which observed the witnesses, etc.) could reasonably have found otherwise. The Cheathams were a typical young married couple. Mr. Cheatham was twenty-seven years old. He had graduated from high school and then gone into the service. He was Honorably Discharged from the Army and married Mrs. Cheatham in November of 1971. He worked full time as a bank teller, changing jobs a couple of times for a higher salary, until he began working at Pitney-Bowes. Since his marriage he has held down a full time job and tried to attend night classes to further his education. At the time of his death, Mr. Cheatham was working full time at Pitney-Bowes and going to night school three nights a week. The couple had only been married three and one-half years prior to Mr. Cheatham's untimely demise. Mr. Cheatham made time, in between holding down a full time job and going to night school to take his young wife out almost every Friday night. They also had the joy of sharing the birth of their child. The fact that there is no twenty or more year history of marital bliss does not mean that the couple was not close and happily married, and there was no evidence to the contrary. That Mrs. Cheatham and her young son *378 were only twenty-two and two and one-half years old respectively, conversely suggests that the period during which they will suffer the loss of love and affection of Charles Cheatham will be an extensive one. Therefore considering the record as a whole, we find that although the awards may have been high they were within a discretionary range such that we cannot say that the jury erred. These awards therefore should not have been reduced. We reinstate this portion of the trial court award.
The final award by the jury was $279,000 to Mrs. Cheatham, to compensate the family for the loss of support which Mr. Cheatham would have provided during his life had he not been killed. The Court of Appeal reduced this award to $120,000 for Mrs. Cheatham and to $35,000 for the child. The Court reasoned that the economist's testimony was not clear and that his starting figure may have been based on Cheatham's gross earnings rather than net. Also, the court felt that the award was defective in that it included a 3% yearly increase for anticipated promotions and merit raises.
For these reasons the Court of Appeal held that the trial court award in this area evidenced an abuse of discretion.
The economist's testimony was not countered in any way at trial. In fact he was not even cross-examined. It is evident that the jury based its award upon his testimony, for the award of $279,000 was very close to $273,587, which was the economist's final figure.[11] While the economist's calculations may not have taken into account the difference in Cheatham's anticipated gross pay and his net pay, principally income tax and social security tax withholdings (a relatively small sum considering the fairly meager pay range) there were the offsetting considerations for the jury that the economist used a mere 3% inflation increase factor (and it has been as high as 13% of late), he did not take into account as part of the income the 5% commission Cheatham was earning in his job, and he used a 30% consumption factor (for a family of two) rather than 26%, which his tables indicated was the appropriate percentage for a family of three.
*379 In our view, the trial court did not abuse its discretion in awarding $279,000 for plaintiffs' loss of support.[12]
We do find, however, that the trial court erred in giving this entire portion of the award to Mrs. Cheatham alone. In wrongful death cases, each beneficiary of the primary class must prove the extent of his or her own damages. The support loss should have been apportioned between the wife and child, to the extent that each was damaged.
Considering that Mrs. Cheatham might reasonably have expected support from her husband for the thirty-three years of his work life expectancy and the minor child might reasonably have expected to be supported only until the age of eighteen, or thereabout, apportionment of the $279,000 support loss award would more appropriately be $209,250 (three-fourths) to the wife and $69,750 (one-fourth) to the child.

Decree
For the foregoing reasons the Court of Appeal judgment will be affirmed insofar as it casts defendant Daniel DeNoux; it will be reversed insofar as it exonerates Stephen Reboul and the City of New Orleans; it will be reversed insofar as it denied recovery in the survival action and insofar as it reduced the damage awards in favor of Mrs. Cheatham and Charles Cheatham, Jr. for mental pain, anguish, loss of love and affection, and for loss of support. There will be judgment herein in favor of Mrs. Cheatham individually and as administrator for and on behalf of the minor Charles Cheatham, Jr. and against Daniel DeNoux, Stephen Reboul and the City of New Orleans jointly, severally and solidarily in the respective sums of $416,750 and $202,250.
JUDGMENT AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
BLANCHE, J., concurs in part, dissents in part and hands down reasons.
MARCUS, Justice (concurring in part and dissenting in part).
I disagree with the finding of the majority that Reboul's negligence was a proximate cause of the death of Charles Cheatham. I do not believe that Reboul could have reasonably foreseen that his scuffling with Cheatham would lead to DeNoux fatally shooting an unarmed man.
I agree that the several admissions made by the city that the officers were acting within the course and scope of their employment at the time of the incident, and the plaintiffs' reliance on these admissions, precluded the city from asserting a contrary position on appeal. Hence, I consider it unnecessary to pass on the issue raised in footnote 7 of the majority opinion.
I agree that the jury abused its discretion in its award of $50,000 for decedent's pain and suffering. However, I consider $10,000 to be the maximum reasonable award within the discretion of the jury.
I agree that the jury did not abuse its discretion in awarding $279,000 for plaintiffs' loss of support and that the majority properly apportioned this award between decedent's widow and his minor son.
I disagree with the majority's finding that the jury did not abuse its discretion in awarding $200,000 to decedent's widow and $125,000 to his minor son for loss of love and affection. In my view, the jury clearly abused its discretion in making these awards, which should be reduced to $100,000 to decedent's widow and $50,000 to his minor son, the maximum reasonable awards within the discretion of the jury.
*380 Accordingly, I concur in part and dissent in part.
BLANCHE, Justice (dissenting in part; concurring in part).
The court of appeal was correct in finding that Reboul did not shoot Cheatham, and in my opinion, any finding to the contrary is clearly wrong. Neither could this writer find that Reboul, by engaging in a fight with Cheatham, could foresee that his partner would shoot Cheatham any more than this writer could hold that Cheatham, by engaging in a fight with Reboul, could expect to be shot. Admittedly, in these days and times, one who voluntarily and physically engages in an affair which is none of his business may regard such a possibility as a reasonable consequence.
I concur, however, in the finding that the city is responsible for the reasons assigned by the majority but simply would exonerate Reboul.
Finally, I agree with the Court of Appeal that the award was excessive and should have been reduced. Specifically, the $50,000 award for pain and suffering is not supported by the evidence and our award for $15,000 is purely speculative. Cheatham never regained consciousness after the fatal shot and there is no evidence as to what injuries he may have suffered in the fight.
Finally, I am unable to approve an award of $200,000 for loss of love and affection. I do not agree with the reasons advanced by the court of appeal to justify the reduction. This young woman has her life ahead of her and human experience is in favor of her future happiness with many fulfilling interests and experiences. Such an award would only be conceivable in reasonable belief that her future was one of loneliness and mourning. It may be noted that no prior award to a widow is cited in justification of this award. Indeed, this writer could find no Louisiana award for damages even in the "ball park".
For these reasons, I concur in the judgment insofar as it casts the City of New Orleans for damages; I dissent from the finding of liability on the part of Reboul and dissent with regard to the award of damages as being both speculative and excessive.
NOTES
[1] Louisiana Code of Civil Procedure Article 1731 expressly recognizes a person's right to a trial by jury except in limited situations. R.S. 13:5105 provides that no suit against the state or other public body shall be tried by jury. In a case where one defendant is not a public body and one defendant is, the portion of the case involving the former is tried by jury and the portion of the case involving the latter is tried by the judge simultaneously.
[2] The assistant city attorney, by then no longer employed in the city attorney's office because of a change in city administrations, thereupon commenced representing DeNoux and Reboul only. The city attorney's office commenced representing only the City of New Orleans. In this Court the former assistant city attorney has represented DeNoux. Reboul has obtained other counsel.
[3] Cheatham v. City of New Orleans, et al., 371 So.2d 618 (La. 1979).
[4] The trial court's findings that DeNoux was guilty of negligence proximately causing the death of Cheatham and that Cheatham was not contributorily negligent, were affirmed on appeal. Assignments of error with respect to these determinations have not been urged in any writ applications. These determinations are therefore final and may not be reviewed here. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971).
[5] The jury had been told in the charge that negligence was "the doing of some act which a reasonably prudent person would not do, or failure to do something which a reasonably prudent person would do when prompted by considerations which ordinarily regulate the conduct of human affairs." The jury was further instructed that by proximate cause is meant "the primary or moving cause or that which is a natural and continuous sequence unbroken by any intervening cause producing the injury and without which the accident or injury could not have happened."
[6] Louisiana Revised Statutes Title 37, Chapter 4, Article 16, Canon 5, Section DR5-105.
[7] Although for the procedural reasons given above we find it unnecessary to resolve the course and scope issue in this litigation, we note that the evidence in the record more likely than not established that the officers' conduct was in the course and scope of their employment. Among the reasons that prompt this conclusion are the following: (1) the officers were required, by police regulation, to carry their guns with them even when they were off-duty; (2) police regulations also required off-duty officers to quell any disturbances occurring in their presence; (3) it was considered a breach of duty under police regulations for an off-duty officer not to quell a disturbance; (4) a disturbance of the peace indeed had occurred, with the shoe-shine boy making a nuisance of himself; (5) the officers, although off-duty, were attempting to quell the disturbance created by the shoe-shine boy, as required by police regulations, when Cheatham intervened; (6) the use of excessive force by a policeman while in the course of doing his duty does not put the officer outside of the course and scope of his employment. Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977); Taylor v. City of Baton Rouge, 233 So.2d 325 (La.App. 1st Cir. 1970).
[8] La.Const. of 1974, art. V, § 10(B) provides the scope of review for appellate courts as follows: "Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts."
[9] Louisiana Civil Code Article 1934(3) provides in pertinent part:

"Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. ...
In the assessment of the damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none, ..." (Emphasis added).
[10] Mrs. Cheatham testified that she and her husband would go out to the French Quarter almost every Friday night, but that on that particular night she really did not feel like going. So he called one of his friends and went.
[11] Dr. Melville Wolfson, an economics professor at the University of New Orleans, testified as an expert for plaintiff. His testimony was uncontradicted. He based all his calculations on the assumption that Cheatham was earning $800.00 per month (it is unclear from the testimony whether this was considered his gross income or his net income, but the economist stated that it did not include the 5% commission Cheatham was earning). Dr. Wolfson first calculated the amount of support lost from the date of death to the date of trial by multiplying $800.00 per month times twelve months, which equals $9,600.00. Then he took $9,600. and divided it by 365 (the number of days in a year) to figure out how much Cheatham earned each day, which was $26.30. He then multiplied $26.30 times 738 (the number of days from the date of death till the trial) and found that Mr. Cheatham would have earned $19,400.00 during that time. The economist took the $19,400 figure and made an adjustment (from various tables and statistical reports) for the amount Cheatham would have spent on himself during that time, 30%, to reach a final figure of $13,587.00 for the loss of support suffered from the date of death till trial.

Dr. Wolfson went through a series of calculations to determine how much the family lost in support from the date of trial to the end of Cheatham's expected work life, and how much money it would take today to provide the amount lost. Again, based on the $800.00 per month figure, the economist explained his calculations as follows: He first stated that Cheatham had a thirty-three year work life expectancy. He multiplied $9,600 times 33 and came up with $316,000. He discounted that figure at 5%, which brought the figure down to $153,624. He then added in a 3% annual inflation factor to allow for inflation over the next 33 years, bringing the figure to $225,000. He also added in a 3% increase for merit and promotional raises (Cheatham was in school furthering his education and therefore probably his job skills) which increased the total to $352,000. This figure, $352,000, was decreased by a 30% consumption rate (the average amount a man spends on himself in a family of two; the figure decreases for every addition to the family) and the final figure for loss of support for the family, from the date of trial to the end of his work life, was $260,000. The economist added $260,000 (the loss of support suffered from the date of trial to the end of Cheatham's work life expectancy) to $13,587 (the loss suffered from the date of death until trial) to reach the final figure of the total loss to Mrs. Cheatham and her son, for the support Mr. Cheatham would have provided, which equaled $273,587.
[12] While the jury's answers to interrogatories on this item referred to loss of past and future earnings of the deceased husband, it is evident that the element intended was for loss of support for the wife and the child. The only testimony on this point was that of Dr. Wolfson, who testified to several different calculations. His loss of support calculation (essentially 70% of lost earnings) was $273,587.00. His loss of wages figure was $352,000. Since the jury awarded $279,000, it is clear that their award was for loss of support and not loss of wages irrespective of what it was labeled in the interrogatories.