LILJEBERG, J.
Plaintiff, John Mosbey, Jr., appeals a judgment entered by the trial court on September 8, 2017, against defendants, Joseph P. Lopinto, III, Sheriff of the Parish of Jefferson ("Sheriff") and its employee, Dale Bruce. Plaintiff argues the judgment is erroneous for three reasons: 1) the trial court awarded less than the proven and stipulated amount for past medical expenses; 2) the trial court failed to award future medical expenses; and 3) the trial court failed to award future general damages. For reasons stated more fully below, we affirm the trial court's judgment.
PROCEDURAL BACKGROUND
On December 29, 2011, Dale Bruce, a Jefferson Parish Sheriff's Office deputy, struck the back of a Ford F-250 pickup truck driven by plaintiff on Transcontinental Drive in Metairie, Louisiana. Plaintiff was slowing to turn into a private driveway when the accident occurred. On November 20, 2012, plaintiff filed a petition for damages against the Sheriff and his employee, Mr. Bruce, seeking past and future medical expenses and general damages. Prior to trial, defendants stipulated that Mr. Bruce was acting in the course and scope of employment at the time of the accident and also stipulated to liability.
A bench trial was held on August 28, 2017. At the conclusion of the trial, the judge took the matter under advisement. On September 8, 2017, the trial court signed a final judgment and declared defendants "liable to Plaintiff for damages as a result of the collision at issue in this litigation." The trial court awarded plaintiff past medical expenses and general damages as follows:
• $21,186.71 in special damages ($18,513.00 for medical visits and $2,673.71 for prescriptions); and
• $64,000.00 in general damages ($2,000.00 a month for 6 months; $1,000.00 a month for 42 months; and $500.00 a month for 20 months).
The trial court did not award future medical expenses or future general damages and did not provide written reasons for its decision. On September 27, 2017, plaintiff filed a timely motion and order for devolutive appeal, which the trial court granted on the same day.
On appeal, plaintiff contends the trial court erred by failing to award him the full amount of past medical expenses proven at *1114 trial. He further argues the trial court was clearly wrong by failing to award future medical expenses and general damages because he suffered permanent injuries to his cervical spine and nerves, and suffered from carpal tunnel syndrome in both wrists as a result of the accident. He contends that he continues to suffer from chronic headaches and neck pain, sleep difficulties and erectile dysfunction, all requiring future medical treatment. He further argues that all of his treating physicians indicated the accident at issue was the cause of his ongoing complaints.
Defendants argue in response that the evidence demonstrates inconsistencies between plaintiff's claims regarding the nature of his complaints and the complaints reflected in his medical records. They also argue that plaintiff's treatment was limited to two delayed epidural steroid injections and pain medication and he failed to take appropriate steps to properly address his injuries over the past six years. Defendants argue the trial court did not believe plaintiff was credible and believed he was exaggerating his symptoms. They argue the trial court correctly determined that plaintiff's injury was an exacerbation of a pre-existing condition that could have resolved if plaintiff followed his treating physicians' recommendations in a timely manner.
FACTUAL BACKGROUND
At the time of the accident, plaintiff was 34 years old. He testified that he dropped out of school when he was in the seventh grade to work for his father as a mechanic in his transmission shop. In 1996, plaintiff opened his own transmission shop, which he continued to operate at the time of the trial.
Plaintiff testified that his vehicle was totaled as a result of the accident at issue and he suffered injuries to his neck and mid-back between his shoulder blades. Following the accident, he complained of headaches, arm numbness, and arm and back pain. Plaintiff testified that before the accident, he did not take any medicine and did not suffer from any of the symptoms he continues to experience. Plaintiff also testified that since the accident, he has not sustained any other injuries and this is the only lawsuit he has ever filed. He testified that due to the accident, he is unable to work the same hours in his shop as prior to the accident.[1] He also testified that he can no longer engage in his hobby of restoring and showing antique cars.
Five days after the accident, plaintiff went to see an internist, Dr. Leia A. Frickey, at Metairie Health Care Center. Plaintiff complained of right shoulder pain, right arm pain, neck pain with right hand numbness/tingling sensations, right calf pain and headaches. Dr. Frickey recommended therapy treatments consisting of moist heat, electromuscular stimulation and ultrasound, as well as stretching exercises at home. She also prescribed Naproxen and Flexeril. On direct examination, plaintiff testified the therapy did not alleviate his symptoms. However, Dr. Frickey's records from plaintiff's March 16, April 19, and June 21, 2012 visits indicate that plaintiff reported the "modality treatments/exercises were helpful."
On cross-examination, plaintiff initially denied his headaches became less frequent and severe during his treatment with Dr. Frickey. When confronted with Dr. Frickey's medical reports indicating plaintiff eventually reported after several months of treatment that his headaches were light and rare, plaintiff explained the medication prescribed by Dr. Frickey helped with the headaches. Plaintiff denied the accuracy of Dr. Frickey's May 18, 2012 report, which stated plaintiff was no longer *1115 experiencing headaches. Defense counsel also questioned plaintiff regarding the frequency of the therapy treatments he received during the six months he treated with Dr. Frickey. Plaintiff recalled going for treatment once a week. Defense counsel noted that Dr. Frickey's records indicated plaintiff only went for therapy treatments on four occasions during his six months of treatment with her.
Plaintiff testified that because he was still experiencing problems, he decided to consult with an orthopedic surgeon, Dr. George Murphy. Plaintiff testified that during his first visit on July 10, 2012, he told Dr. Murphy he was experiencing headaches, pain in his arm/mid-back/between the shoulder blades and numbness in his arm. Dr. Murphy's notes from that visit do not mention headaches, but indicated plaintiff reported pain in his neck and across his shoulders, numbness in his right arm from the elbow down and tingling in his left arm from the elbow down. Plaintiff reported that he experienced these symptoms at "night time." Dr. Murphy diagnosed plaintiff with cervical strain and also noted plaintiff had "a positive Phalen's test in both wrists indicating carpel tunnel syndrome." Dr. Murphy reported plaintiff "will get a brace for both wrists." Plaintiff testified that he wore the wrist brace "[f]or a little while."
On cross-examination, defense counsel questioned plaintiff as to why Dr. Murphy's records did not reference his complaints regarding headaches during his initial visit on July 10, 2012.[2] Plaintiff testified that he reported his complaints regarding headaches to Dr. Murphy at his very first visit and could not explain why his records did not reference the headaches he was experiencing.
Following plaintiff's first visit, Dr. Murphy ordered an MRI (magnetic resonance imaging ). Plaintiff returned to see Dr. Murphy on July 23, 2012. Dr. Murphy's notes indicated the braces helped "the carpal tunnel," and the MRI found degeneration and bulging. Furthermore, because plaintiff was experiencing radiating pain from his neck into both of his upper arms, Dr. Murphy ordered an EMG (electromyography ) and nerve conduction study of both upper extremities, and prescribed Rozerem and Ultram.
Dr. Murphy's next visit with plaintiff was on October 30, 2012, following the completion of the nerve testing. Dr. Murphy explained that Dr. Daniel Trahant conducted the testing and reported damage to the left C6 nerve root in plaintiff's neck and carpal tunnel syndrome in both wrists. Dr. Trahant did not find any nerve root pathology on the right side. Based on the results of these tests, Dr. Murphy believed plaintiff was a good candidate for an epidural steroid injection. He explained that the injection is an outpatient procedure that can be done in a day and can reduce swelling or irritation in the area and quiet the nerve symptoms. He further testified that, in some cases, one injection can quiet the symptoms so that the patient does not need any further treatment.
Dr. Murphy's notes from the next visit on January 8, 2013 indicate that plaintiff delayed the epidural steroid injection because he had the flu. Dr. Murphy also noted that he prescribed plaintiff Norco for pain and Ambien for sleep. In February 2013, plaintiff indicated he could not set the appointment for the injection because his wife needed major surgery. Dr. Murphy's notes from October 8, 2013 indicate that plaintiff's wife finally had the surgery and plaintiff would try to obtain an appointment for the injection. Over the next several months, plaintiff scheduled *1116 and cancelled several injection appointments.
Almost two years after Dr. Murphy's initial recommendation and almost 11 months after his wife's surgery, plaintiff obtained a cervical epidural steroid injection on August 27, 2014, from Dr. Charles N. April. Though plaintiff testified at trial that the injection provided no relief, Dr. Murphy's notes from his September 23, 2014 visit with plaintiff indicate otherwise:
He finally had the injections. The headaches have been less severe and there is less arm numbness. He still has radiation of pain into the arm. He should see about having a 2nd set of shots. New prescriptions were written. He will return for routine follow-up.
According to Dr. Murphy's notes, plaintiff waited almost another eight months to obtain the second injection and reported that it aggravated rather than helped his symptoms for a period of time. On June 2, 2015, Dr. Murphy noted that plaintiff needed to start to decrease his medication since he does not want to consider other treatment options. Plaintiff continued to see Dr. Murphy until the end of 2016, when he suggested plaintiff should consult with a neurosurgeon and neurologist regarding his neck problems.
Dr. Murphy testified in his trial deposition that the injuries suffered by plaintiff were caused by the accident at issue. He also testified that he believes plaintiff's injuries are permanent and he will continue to require medical care and medication into the future for his injuries, particularly due to plaintiff's line of work as a mechanic. He did not believe plaintiff was exaggerating his conditions or seeking medication, and his clinical findings were consistent with the diagnostic tests.
Plaintiff consulted with a neurosurgeon, Dr. Rand Voorhies, in January 2017. Dr. Voorhies ordered a SPECT scan and indicated if the results were positive, he would need additional testing. Following the scan, Dr. Voorhies met with plaintiff again on March 3, 2017. He informed plaintiff that smoking and nicotine in all of its forms exerts a powerful negative effect and noted plaintiff smoked one and a half packs per day. He also informed plaintiff that because the SPECT scan noted several abnormalities, plaintiff needed to undergo a myelogram /CT scan before he could present plaintiff with surgical options. Dr. Voorhies further noted that:
After a thorough discussion of all of these issues, Mr. Mosbey communicated to me his ambivalence. On the one hand he certainly wants his pain syndrome to go away and to be rid of his five year ongoing affliction. On the other hand, he understands that there can never be any guarantees or promises regarding surgery in general, and specifically he has formulated the very definite opinion (apparently based on communication with friends and acquaintances) that a lumbar puncture is a 'nightmare' and he is unwilling to consider the myelogram /CT scan of the cervical spine (which for the reasons explained above I personally would require in an effort to try to plan the best surgical option for him.)
Plaintiff testified that Dr. Voorhies wanted to conduct additional tests, but told plaintiff "there was no guarantee that he can fix my problem. It could be better; it could be worse." Plaintiff did not want to go forward with testing to determine if surgical options existed to alleviate his pain without a guarantee of success.
Plaintiff also went back to neurologist, Dr. Trahant, in January 2017, complaining of worsening neck pain, daily headaches, cervical pain primarily on the right side, and numbness, tingling and tremors in both hands. Dr. Trahant ordered another EMG/nerve conduction study in March *1117 2017 and changed plaintiff's medication to a muscle relaxant, Zanaflex, and 7.5 mg of Percocet for pain. Dr. Trahant noted that since the prior tests and studies, the left C6 nerve root findings were more prominent and also found new damage involving the right C6 nerve root. He also found evidence of pathology involving the right C5 motor root.
In his trial deposition, Dr. Trahant testified that Mr. Mosbey is a candidate for surgery. Furthermore, in his May 3, 2017 report, Dr. Trahant noted that plaintiff met with neurosurgeon, Dr. Voorhies, who recommended a myelogram and post-myelographic CT scan to search for a solution to plaintiff's pain. However, plaintiff was adamant that he did not want a myelogram procedure and preferred to use medication to alleviate his pain. Dr. Trahant also noted that based on plaintiff's refusal to undergo further diagnostic procedures, he was at "maximum medical improvement:"
I explained to Mr. Mosbey that unless we can proceed further from a neurodiagnostic standpoint with the myelogram and CT Scan, we would be unable to make any specific recommendations for cervical spinal surgery options. In this regard, he is at maximum medical improvement under these circumstances.
In his trial deposition, Dr. Trahant further testified that plaintiff received erroneous information from friends and family about the myelogram procedure and as a result, declined to have it performed. Dr. Trahant agreed that more probably than not, plaintiff's cervical pain, carpal tunnel, headaches and erectile dysfunction were caused by the accident at issue. He also testified that plaintiff's conditions will require future medical care in the form of continued prescription medications and doctor visits and diagnostic testing.
However, on cross-examination, Dr. Trahant indicated that he was not aware plaintiff waited two years to obtain the epidural steroid injections after they were recommended by Dr. Murphy. Dr. Trahant agreed that though the injections do not fix the underlying structural problems, the delay in receiving treatment could certainly worsen plaintiff's condition "[b]ecause the longer nerves are subjected to ... a pathological process that affects the nerves, whether it's inflammatory or direct pressure from a bone spur or disc, the more likely there is to be scarring of a nerve and permanent changes." Dr. Trahant further agreed that in his opinion, "it probably would have been wiser to get that treatment sooner rather than later." Dr. Trahant also testified that plaintiff has degenerative changes in his neck due to some degree of wear and tear caused by plaintiff's work. He explained that the accident caused an aggravation of his degenerative changes and made them symptomatic.
Dr. Trahant noted that at the time of trial, he was continuing to treat plaintiff's condition with medication, including muscle relaxants, Zanaflex at night and Flexeril during the day, and Percocet (Oxycodone ) for pain. In his notes from his August 15, 2017 visit with plaintiff, Dr. Trahant noted "continued conservative management is certainly appropriate."
Plaintiff testified that at the time of trial, he was still treating with Dr. Trahant and was still complaining of headaches, numbness, pain in the upper area of his back and sleeplessness. Plaintiff explained that he continues to take medication every day for his injuries. He takes Aleve or Advil in the morning and one Flexeril, a muscle relaxant. He is able to work until around 3 p.m. and takes a pain pill when he gets home.[3] At the time of trial, plaintiff *1118 indicated that Dr. Trahant prescribed 90 Percocets per month. He indicated that he took two of these pills per day on average. The trial court asked plaintiff what he did with the extra medication left over at the end of the month and plaintiff stated that when he obtains a new prescription, he would "flush" any medication left over from the prior prescription. Plaintiff also testified that he developed erectile dysfunction and was prescribed medication. Dr. Trahant testified that erectile dysfunction is a side-effect of the pain medication plaintiff was taking.
Both parties also submitted reports from vocational rehabilitation experts into evidence. Plaintiff's vocational rehabilitation expert calculated future medical expenses up to $38,522.35 per year. Defendant's expert calculated that plaintiff would incur a future one-time cost of $4,450.00 for future diagnostic testing, plus future medical expenses of $11,291.74 per year.
DISCUSSION
Second Assignment of Error-Past Medical Expenses
In his second assignment of error, plaintiff argues the trial court erred by awarding less than the proven and stipulated amount of past medical expenses. Plaintiff claims that at the beginning of trial, he introduced exhibits for past medical expenses and prescription bills totaling $26,056.53, but the trial court only awarded $21,186.71. This included $18,513.00 for medical visits and $2,673.71 for prescription costs. Plaintiff contends that defense counsel agreed to the amount of past medical expenses and did not object to the introduction of the exhibits establishing these expenses into evidence. Plaintiff contends defense counsel's agreement constituted a stipulation as to the amount of past medical expenses and the stipulation qualified as a judicial confession.
Compensatory damages are divided into special damages and general damages. Special damages, such as medical expenses, can be determined with relative certainty. Wainwright v. Fontenot , 00-492 (La. 10/17/00), 774 So.2d 70, 74 ; Beausejour v. Percy , 08-379 (La. App. 5 Cir. 10/14/08), 996 So.2d 625, 628. General damages are inherently speculative in nature and cannot be fixed with any mathematical certainty. Wainwright , 774 So.2d at 74.
A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Williams v. Walgreen La. Co., Inc. , 14-716 (La. App. 5 Cir. 2/25/15), 168 So.3d 812, 824, writ denied , 15-610, 15613 (La. 6/1/15), 171 So.3d 262. A plaintiff may recover past medical expenses that he incurs as a result of an injury due to the fault of another. Tamayo v. Am. Nat'l Gen. Ins. Co. , 14-130 (La. App. 5 Cir. 9/24/14), 150 So.3d 459, 470. To recover medical expenses, the plaintiff must prove that, more probably than not, the medical treatment was necessitated by the accident. Id. The trier of fact errs by not awarding the full amount of medical expenses incurred as a result of injuries caused by the accident when the record demonstrates the victim proved them by a preponderance of the evidence. Id.
La. C.C. art. 1853 defines a judicial confession as follows:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
The statement constituting a judicial confession must be the express acknowledgement of an adverse fact, the effect of which is to waive evidence as to the subject of the confession or to withdraw the matter from issue.
*1119 Cheatham v. City of New Orleans , 378 So.2d 369, 375 (La. 1979) ; Jones v. Gillen , 564 So.2d 1274, 1279 (La. App. 5th Cir. 1990). For these effects to be imposed, however, the other party must have been led to believe the fact was not at issue or he must have relied on the statement to his detriment. Gillen, 564 So.2d at 1279.
Our review of the record indicates that defense counsel did not stipulate or agree to the amount of past medical expenses. At the beginning of trial, plaintiff's counsel offered, filed and introduced medical and prescription bills as exhibits and stated the total amount billed to plaintiff by each medical provider. At the end of the introduction, plaintiff's counsel stated: "[p]laintiff's calculations of past medical expenses to date are $26,056.53." The trial court then asked defense counsel if he agreed "with all those-those exhibits being introduced without objection." Defense counsel responded, "Yes, Your Honor. No objection."
We do not find that this exchange qualifies as a stipulation or judicial admission by defendants as to the amount of past medical expenses. Stating that no objection exists to the introduction of medical bills does not constitute an express acknowledgement that the medical expenses set forth in the exhibits are recoverable or otherwise necessitated by the accident.
Furthermore, it is apparent from the record that the amount of past medical expenses the trial court excluded from its award was a portion of plaintiff's prescription expenses. At trial, plaintiff introduced a global exhibit that included receipts from various pharmacies totaling $7,543.53. Most of the receipts do not identify the name of the patient, the prescribed medication or the name of the prescribing physician. Some receipts contain non-prescription items. Plaintiff did not review or identify any of these receipts during his trial testimony.
Included within this global exhibit is a printout of prescription costs from a Walgreens Pharmacy covering a period from 1/1/2017 to 8/23/2017. The printout lists plaintiff as the patient, provides the name of the prescribing physician and the medication prescribed. The cost of the prescriptions on the Walgreens printout totals $2,673.71, the amount awarded by the trial court.
In Reid v. Allstate Ins. Co. , 407 So.2d 34, 36-37 (La. App. 3rd Cir. 1981), the appellate court ruled that prescription receipts, which failed to include the complete date and the identity of the prescribed drug, were insufficient to satisfy the plaintiff's burden of proof absent a stipulation from the defendant acknowledging their connection to the accident at issue. The court noted:
The copy of the prescription receipts show the day and month filled but fail to show the year. The medication prescribed is represented by a number alone. Without more, we have no way of knowing whether or not the prescribed medication is recoverable under the insurance policy or whether or not it properly relates to this suit.
Id. at 36-37 fn. 1.
The trial court in the instant matter obviously determined that prescription receipts lacking information to identify the patient, prescription and prescribing physician were insufficient to satisfy plaintiff's burden to establish these were expenses incurred as a result of the accident. We do not find the trial court was manifestly erroneous by failing to award some of plaintiff's past prescription costs based on the receipts provided by plaintiff.
First and Third Assignments of Error
In his first and third assignments of error, plaintiff argues the trial court erred by failing to award him future medical expenses and future general damages.
*1120 As discussed above, the plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue. Harrington v. Wilson , 08-544 c/w 08-545 (La. App. 5 Cir. 1/13/09), 8 So.3d 30, 38-39. A presumption of causation will aid a plaintiff in meeting this burden, if before the accident, the injured person was in good health, but, commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be reasonable possibility of a causal connection between the accident and the disabling condition. Housley v. Cerise , 579 So.2d 973 (La. 1991). To rebut this presumption, defendant must show that some other particular incident could have caused the injury in question. This is a factual issue, reviewed by an appellate court under the manifest error standard. Harrington , 8 So.3d at 39.
The fact finder is not precluded from making determinations regarding the credibility of witnesses and respect should be given to those conclusions. Id. After weighing and evaluating the medical testimony, the trier of fact may accept or reject the opinion expressed by the medical expert. The fact finder should evaluate the expert testimony by the same rules which are applicable to other witnesses and the trial court is not bound by expert testimony. Id.
When conflicts in the evidence exist, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO , 549 So.2d 840, 844 (La. 1989). The issue to be resolved by the reviewing court is not whether the factfinder was right or wrong, but whether his conclusion was a reasonable one. Stobart v. State through Dep't of Transp. and Dev. , 617 So.2d 880, 882 (La. 1993). Thus, where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell , supra . Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Guillory v. Lee , 09-75 (La. 6/26/09), 16 So.3d 1104, 1117.
In accordance with well-established law, much discretion is left to the judge in the assessment of quantum, both general and special damages. La. C.C. art. 2324.1 ; Menard v. Lafayette Ins. Co. , 09-1869 (La. 3/16/10), 31 So.3d 996, 1006-07. Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. Menard , 31 So.3d at 1007.
Future Medical Expenses
In order to recover future medical expenses, the plaintiff must prove the expenses will be necessary and inevitable. Gunn v. Robertson , 01-347 (La. App. 5 Cir. 11/14/01), 801 So.2d 555, 565, writ denied , 02-170, 02176 (La. 3/22/02), 811 So.2d 942. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable costs. Id.
An appellate court, in reviewing a trial court's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. Id. This test requires a reviewing court to do more than simply review the record for some evidence which supports or controverts the trial court's findings. Id. The court must review the entire record to determine *1121 whether the trial court's finding was clearly wrong or manifestly erroneous. Id. The issue to be resolved on review is not whether the judge was right or wrong, but whether the judge's fact finding conclusion was a reasonable one. Id.
After reviewing the entire record, we find a reasonable factual basis exists for the trial court's denial of an award of future medical expenses and further find the trial court was not clearly wrong in its determination. As set forth above, inconsistencies exist between plaintiff's testimony at trial and the treating physicians' medical records with respect to several aspects of plaintiff's treatment. Furthermore, the evidence indicates that plaintiff did not always obtain the treatments or follow the recommendations provided by his treating physicians. First, plaintiff denied his headaches became less frequent and severe while treating with Dr. Frickey, though near the end of plaintiff's treatment with Dr. Frickey in May 2012, the medical records indicate plaintiff was no longer experiencing headaches. Plaintiff also claimed that the therapy treatments did not alleviate his symptoms, but Dr. Frickey's records indicate that plaintiff reported they were helpful. Plaintiff claimed he received these treatments once a week, but Dr. Frickey's billing records indicate that plaintiff received only four treatments during the six months he treated with Dr. Frickey.
Plaintiff also testified that he told Dr. Murphy about his headaches when he began treatment with him in July 2012. Dr. Murphy's records do not mention that plaintiff was experiencing headaches until 2014. On his first visit, Dr. Murphy recommended that plaintiff wear braces to treat the carpal tunnel syndrome in plaintiff's wrists. Plaintiff testified that he only wore the braces "for a little while." In addition, Dr. Murphy recommended plaintiff undergo an epidural steroid injection in October 2012, but plaintiff did not have the injection performed until almost two years later in September 2014. Plaintiff testified that the injection he received on August 27, 2014 did not provide relief for his symptoms. However, Dr. Murphy's notes from plaintiff's visit almost a month later on September 23, 2014 indicated that following the injection, plaintiff's headaches were less severe and plaintiff had less arm numbness. Dr. Murphy recommended a second injection, but plaintiff waited almost eight months to follow this recommendation.
Plaintiff's treating neurologist, Dr. Trahant, testified that the delays in receiving the epidural steroid injections could have worsened plaintiff's condition:
Q. It's my understanding that early on in Mr. Mosbey's treatment there had been some recommendations for epidural steroid injections.
A. Right.
Q. But ... according to him ... he waited ... about two years before having them done. Were you aware of that or?
A. No.
Q. Okay. Well, I believe the record would reflect that that would be the situation. Would that have any bearing on the-the worsening of his condition in your mind?
A. It could, certainly. Because the longer nerves are subjected to path-a pathological process that affects the nerves, whether it's inflammatory or direct pressure from a bone spur or disk, the more likely there is to be scarring of the nerve with permanent changes.
Dr. Trahant also testified that plaintiff was a candidate for surgery. However, Dr. Trahant and Dr. Voorhies both explained to plaintiff that they could not provide any recommendations for surgical treatment *1122 unless plaintiff underwent additional diagnostic testing, which plaintiff refused. Dr. Trahant noted that by refusing additional testing plaintiff was at "maximum medical improvement." Plaintiff reported that he preferred to treat his symptoms with medication. Dr. Murphy also noted that he explained to plaintiff that he would have to figure out how to decrease his medication if he chose not to pursue other treatment options.
Based on the conflicts between the medical records and plaintiff's trial testimony, plaintiff's failure/delay in following treatment recommendations, and his refusal to pursue diagnostic testing without a guarantee from doctors as to the success of possible future treatments, the trial court obviously determined plaintiff failed to satisfy his burden of proof to recover future medical expenses. Credibility is paramount in the award of such damages. The trial judge had the opportunity to view the demeanor, as well as hear plaintiff contradict his own medical records. Additionally, the trial judge was presented with evidence that plaintiff waited almost two years to undergo a procedure that could have mitigated his pain problems. Based on the foregoing, we find the trial court's conclusion to not award plaintiff future medical expenses was reasonable and was not clearly wrong.
Future General Damages
Plaintiff also complains the trial court erred in failing to award future general damages.
The trier of fact is also given great and even vast discretion in setting general damage awards, and an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp. , 623 So.2d 1257, 1260 (La. 1993), cert. denied , 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed. 2d 379 (1994). The initial inquiry in appellate review of general damages is "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." Id. Furthermore, findings of fact are subject to the manifest error standard of review. Wainwright, supra.
For the same reasons stated above to affirm the trial court's decision not to award future medical expenses, we also find the trial court was not manifestly erroneous nor did it abuse its vast discretion by declining to award plaintiff future general damages.
DECREE
Based on the foregoing, we affirm the trial court's September 8, 2017 judgment.
AFFIRMED

Plaintiff did not seek an award for lost wages.

Dr. Murphy's records do not mention headaches until September 2014.

Plaintiff testified that prior to the accident, he would work until 6 or 7 p.m.