877 So.2d 1101 (2004)
Diana Pertuit Wife of/and Joyle PERTUIT
v.
STATE FARM INSURANCE COMPANY and Eugene Folse.
No. 04-CA-176.
Court of Appeal of Louisiana, Fifth Circuit.
June 29, 2004.
*1102 Daryl A. Higgins, T.A., Gaudry, Ranson, Higgins & Gremillion, L.L.C., Gretna, LA, for Plaintiffs/Appellees.
John E. Unsworth, Jr., Alayne R. Corcoran, Hailey, McNamara, Hall, Larmann & Papale, L.L.P., Metairie, LA, for Defendants/Appellants.
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY and MARION F. EDWARDS.
THOMAS F. DALEY, Judge.
The defendant has appealed the trial court's judgment in favor of the plaintiff. The plaintiff answered the appeal, seeking a change in the allocation of fault and an increase in damages. For the reasons that follow, we affirm.

FACTS:
The plaintiff, Joyle Pertuit, and the defendant, Eugene Folse, were long time friends, neighbors, and co-workers. They often worked on various projects together. In February, 2000, Mr. Folse sought assistance from Mr. Pertuit to move a garage from one portion of his property to another. In order to accomplish this, the men used jacks to lift the building, placed wooden blocks underneath, and then rolled the building on pipes. On February 29, 2000, when the building was very near the desired location, Mr. Pertuit was placing additional blocks under the front of the building when Mr. Folse lowered a jack causing the building to crush Mr. Pertuit's hand. Mr. Pertuit has undergone extensive treatment for the injury sustained in this accident. He filed suit against Mr. Folse and his homeowner's insurer, State Farm Insurance Company. This matter was tried before a judge who rendered a verdict in favor of Mr. Pertuit. This timely appeal followed.
At trial, Mr. Pertuit testified that he had worked at various jobs over the years including *1103 the maintenance department of American Can Company, the electrical department at Union Carbide, and as a bus driver for the Jefferson Parish School Board. Mr. Pertuit explained that after he became a bus driver, he continued to perform electrical and plumbing work on the side, as well as perform maintenance and repairs on his bus, his wife's bus, and the couple's rental property.
Mr. Pertuit testified that in moving this garage, he and Mr. Folse used jacks to jack up the building. He supplied two piston jacks and Mr. Folse supplied a floor jack. He explained that each man operated his own jack. Mr. Pertuit testified that before they started working they agreed that "we had to look at one another you know and verbally say what to do." He further testified that they did this each and every time a jack was lowered. Mr. Pertuit testified that on the day of the accident, the building was within one foot of the desired location. Mr. Pertuit explained that they decided to stop working for the night, but after pointing out to Mr. Folse that a portion of the building was sagging, they walked back to the building to place more blocks under the sagging area. Mr. Pertuit testified that he was leaning over putting blocks under the building and the next thing he knew the building was on his hand. He denied telling Mr. Folse to lower the jack. He explained that the force of the building landing on his hand caused his face and knee to strike the building. Mr. Folse helped to get his hand from under the building and took him to the emergency room.
Mr. Pertuit testified that after initially being told that he would lose two fingers on his right hand, a hand surgeon, Dr. Juan Escobar, stated that he could save the fingers, but it would be long and drawn out. Mr. Pertuit explained that he lost the tip of his index and long finger of his right hand and underwent eight total surgeries as a result of this accident. He explained that the pain in his hand was initially unbearable and later became tolerable. The fingernail of his index finger continued to attempt to grow and this caused infection and further surgical procedures.
Mr. Pertuit testified that several months after the accident he sought treatment for pain in his knee. He explained that during the initial months following the accident all attention was focused on his hand and although he felt knee pain immediately following the accident, he did not seek treatment for the knee pain until September 2000. He sought treatment from Dr. Chris Digrado for the knee pain, who diagnosed a tear of the medial meniscus, requiring arthroscopic surgery.
Mr. Pertuit also developed carpal tunnel syndrome in his right wrist following the accident, necessitating a surgical procedure on his wrist.
Mr. Pertuit testified that due to the injuries suffered in this accident, he suffered constant pain in his hand. He had loss of strength and coordination in his right hand, which was his dominant hand. This resulted in his being unable to do most of the handyman work he had performed prior to the accident and made it difficult to perform maintenance and repairs on his and his wife's school busses. He testified that since the accident, he has been unable to jog, ride a bike, fish, hunt, bowl, dance for extended periods of time, and perform wood working. His hand is very sensitive to temperature changes, swells, and he has to wear a glove to protect his hand.
Mr. Pertuit testified that prior to the accident he supplemented his income by performing electrical work. He testified that his tax return for 1999 showed income of $4,340.00 for performance of electrical work. He estimated that he had lost approximately *1104 this same amount every year since the accident. Mr. Pertuit testified that he had waited for several years for a maintenance position to open at Harvey Kindergarten School. When this position became available in January of 2003, he applied for the job. During the interview he was told he would have to perform painting and sanding of floors. When he was offered the job he initially accepted, then after further thought and fear that he could not perform all of the duties associated with this position, he declined the job. He testified that this job would have increased his income by $16,658.00 to $19,220.00 per year. He explained that since this job was also working for the school board, his retirement benefits would have been increased also.
Diana Pertuit testified that she had been married to Joyle Pertuit for 43 years. She testified that when she arrived at the hospital following the accident, her husband was in excruciating pain. A procedure was performed on her husband in the emergency room in which they cleaned up the wound and closed it, then they were sent home. She testified that she did not leave him alone for several weeks following the accident and accompanied him to all doctor visits. She explained that prior to the accident, Mr. Pertuit did "everything around the home". Prior to the accident, they danced, ran, jogged, rode bikes, and took several vacations a year. However since the accident, he is unable to do many of these things.
Eugene Folse testified that he had worked with floor jacks for many years and owned the jack he was using at the time of the accident for about 10 years. He testified that at the time of the accident, he and Mr. Pertuit had agreed to stop working for the night and go home. Prior to leaving the worksite, they lowered the jacks. He did not recall any discussion about the building sagging, necessitating the placing of more blocks under the building.
Mr. Folse testified that "each and every time before this incident, there was an acknowledgement, there was a communication both verbal and visual to go ahead and lower the jack." He testified however, that when he lowered the jack on Mr. Pertuit's hand he had not checked to make sure it was ok to do so. He explained that he was unable to see Mr. Pertuit before he lowered the jack.
Mr. Folse testified that since this accident, Mr. Pertuit is unable to do any type of electrical and construction work.
Janet Folse testified that she had been married to Eugene Folse for 38 years. She witnessed the accident. Mrs. Folse testified that the men had just stated that they were going to go home for the night when Mr. Folse stated that he had to go let the jack down. At the time he went to put the jack down, Mr. Pertuit was "doing something". She testified that she did not know why Mr. Pertuit had his hand under the building. Mrs. Folse further testified that Mr. Folse was not able to see Mr. Pertuit prior to lowering the jack, nor did he look around to see where Mr. Pertuit was prior to lowering the jack.
Dr. Juan Escobar was accepted by the court as an orthopedic surgeon with a specialty in plastic and reconstructive hand surgery. He explained that he first saw Mr. Pertuit in the emergency room following the accident on February 29, 2000. The accident had resulted in an amputation of the tip of the index and long fingers. He cleansed and closed the wound on the index finger and told Mr. Pertuit to return to his office. Dr. Escobar testified that Mr. Pertuit returned to his office on March 3, 2000 where he closed the wound on the long finger. On March 6, 2000, he did a skin graft on the long finger. On March 16, 2000, it was necessary to divide *1105 and re-insert the skin graft. Dr. Escobar explained that despite aggressive physical therapy, Mr. Pertuit developed contractures in his index and long fingers. This required surgery to release the contractures. Physical therapy continued, but Mr. Pertuit showed minimal improvement. This necessitated another surgery in June 2000 in an attempt to increase the range of motion of Mr. Pertuit's fingers. Dr. Escobar further explained that he had to perform two surgeries on Mr. Pertuit's index finger to remove small portions of the fingernail that had become infected. Dr. Escobar testified that in September 2000, Mr. Pertuit had reached maximum medical improvement. He performed a disability assessment on Mr. Pertuit and concluded that he sustained 22% impairment of the hand, 20% impairment of the upper extremity, and 12% impairment of the whole person. Dr. Escobar testified that Mr. Pertuit was a compliant patient who put forth maximum effort in the disability assessment.
Dr. Escobar testified that he performed a carpal tunnel release on Mr. Pertuit. Dr. Escobar had a difficult time expressing his opinion on whether the carpal tunnel syndrome resulted from the accident. He explained that during the surgery he extracted a lipoma from the carpal tunnel. He explained that the swelling from the trauma of the accident probably caused the lipoma to swell resulting in the carpal tunnel syndrome.
Dr. Escobar's medical records were admitted into evidence. These records corroborated his testimony.
The deposition of Dr. Chris Digrado was admitted into evidence. Dr. Digrado testified that Mr. Pertuit presented to his office in September 2000 complaining of pain in his left knee since an accident in February 2000. Dr. Digrado diagnosed a tear of the medial meniscus. He performed arthroscopic surgery on Mr. Pertuit. Dr. Digrado testified that he was unable to tell whether this injury was caused by the accident, but that Mr. Pertuit stated that he had no problem with his knee prior to the accident. Dr. Digrado agreed that if Mr. Pertuit had no pain prior to the accident, but had pain after the accident, the accident had to have "exacerbated the problem."
A report from Steve Theriot, an accountant, was introduced into evidence. Mr. Theriot performed calculations on Mr. Pertuit's lost earnings ranging from a loss of $5,000.00 per year up to $20,000.00 per year. The lost earnings range from $163,720.00 to $304,667.00.
Defendants admitted a report from Dan Cliff, another accountant, into evidence. Mr. Cliff calculated lost wages of $1,216.6.00 per year, resulting in future lost wages ranging from $4,247.00 per year to $4,407.00 per year.
The medical records from Dr. D.C. Mohnot, a neurologist who treated Mr. Pertuit for headaches, were also admitted into evidence.
At the conclusion of trial, the trial judge rendered judgment in favor of Mr. Pertuit, assigning 80% fault to Mr. Folse and 20% fault to Mr. Pertuit. Mr. Pertuit was awarded $79,758.00 in medical expenses, $90,000.00 in general damages, $142,127.00 in lost wages/loss of earning capacity. Mrs. Pertuit was awarded $6,500.00 for loss of consortium.

ASSIGNMENTS OF ERROR AND DISCUSSION:
In their first Assignment of Error, the defendants argue the trial judge committed manifest error in assigning only 20% fault to Mr. Pertuit. Defendants contend this was an inherently dangerous activity and Mr. Pertuit had superior knowledge of this activity since he had previously moved buildings in this manner. Defendants argue *1106 that Mr. Pertuit should have known that Mr. Folse was going to lower the jack because they had completed operations for the day. Defendants conclude that Mr. Pertuit should be assessed at least 50% fault.
Mr. Pertuit answered the appeal arguing that he should be found free of fault. He contends that the two men had a verbal and visual protocol for lowering the jacks that they had followed the entire time they had worked on this job except at the time of the accident.
In written reasons for judgment the trial judge stated:
... this Court finds the activity in which the plaintiff sustained injury is inherently dangerous. Whenever an object such as a shed is being moved from one location to another, a risk of injury is present. The plaintiff, Joyle Pertuit, sustained his injuries when the defendant, Eugene Folse, lowered a jack without verbal clearance from Pertuit, which caused the shed to fall on Pertuit's hand. While the [sic] Folse's action caused the injury, the testimony clearly asserts that Pertuit had the knowledge and expertise to be aware of the potential of such an accident as the one sustained. Due to the inherently dangerous nature of the activity in which the plaintiff sustained injuries, this Court finds both parties at fault and attributes Folse 80% at fault and Pertuit the remaining 20%.
Our review of the testimony indicates that the trial judge's allocation of fault is supported by the testimony. Both men testified that before they started the job of moving the shed, they established a protocol whereby they would seek verbal and visual clearance prior to lowering a jack. Mr. Pertuit testified that just prior to the accident, he pointed out an area of the shed that was sagging to Mr. Folse, stating that additional blocks needed to be placed in this area. Mr. Folse had no recollection of this conversation, but admitted that he did not remember all of the events surrounding the accident. Mr. Folse testified that when he lowered the jack at the time of the accident, he did not seek verbal clearance from Mr. Pertuit, nor could he see Mr. Pertuit. Mrs. Folse denied knowledge of the conversation regarding the need for additional blocks under the area of the shed that was sagging, but did testified that Mr. Folse was unable to see Mr. Pertuit at the time he lowered the jack. The trial court's finding that Mr. Folse was comparatively negligent is supported by the fact that Mr. Folse placed his hand under the raised garage without advising Mr. Pertuit and assuring himself that it was safe. We find that the process of moving a shed in this manner is inherently dangerous and Mr. Pertuit voluntarily took part in this project. Thus, we find no error in the trial court's ruling finding Mr. Folse 80% at fault and Mr. Pertuit 20% at fault.
In their second Assignment of Error, the defendants contend that trial court erred in awarding $142,127.00 damages for lost wages/loss of earning capacity to Mr. Pertuit when these damages were not proven with any degree of certainty. The defendants contend that although Mr. Pertuit testified that he was losing approximately $4,000.00 per year because he can no longer perform electrical work, this was not supported with any documentary evidence. The defendants further contend that Mr. Pertuit declined the maintenance job at Harvey Kindergarten School when it was clear that he could have performed the duties associated with this job.
The amount of lost wages do not have to be precisely proven, they must only be shown with "reasonable certainty". Harris v. United Agents Insurance Co. of La., 00-1314 (La.App. 3 Cir. 5/2/01), 784 *1107 So.2d 132. A trial court's award for lost wages is subject to the manifest error standard of review. Ploger v. Reese, 2001-2243 (La.App. 4 Cir. 5/22/02), 819 So.2d 1114.
An award for loss of earning capacity is not able to be calculated with certainty and is speculative. Oubre v. Union Carbide Corp., 99-63 (La.App. 5 Cir. 12/15/99), 747 So.2d 212. For this reason, the trier of fact is given much discretion in making such awards. Id.
In the case at bar, the trial judge awarded a lump sum for lost wages and loss of earning capacity. Mr. Pertuit testified extensively regarding his performance of electrical work for additional income prior to the accident. His 1999 income tax return showed earnings of $4,340.00 for electrical work. Mr. Pertuit estimated that he had lost approximately $4,000.00 per year since the accident due to his inability to perform electrical work. Mr. Pertuit also testified regarding his waiting for the maintenance position of Harvey Kindergarten School to become available. He explained that during the interview he was told that he would be expected to apply a fresh coat of polyurethane to the floors and would do extensive painting. This was corroborated by the testimony of the school principal, Ms. Brown. Mr. Pertuit testified that after he accepted the job, he became concerned that he would be unable to perform these duties due to the injuries he received in the accident, so he declined the job. There is no dispute that this job would have increased Mr. Pertuit's income between $17,600.00 and $19,200.00 per year. Plaintiff submitted a report from a CPA, Mr. Theriot, who estimated that the economic impact suffered by plaintiff as a result of this accident ranged from $162,720.00 to $304,127.00. Given the evidence presented, we cannot say the trial court's award of $142,127.00 was an abuse of discretion.
Mr. Pertuit argues that the general damage award of $90,000.00 for the injuries he suffered in this accident were inadequate and excessively low. He contends that the abusively low award justifies this court raising the award to the lowest reasonable amount.
As in the case of lost wages and loss of earning capacity, in accessing general damages, the trier of fact is given much discretion. Fleming v. Smith, 93-488 (La. 5 Cir. 5/31/94) 638 So.2d 467. In determining whether the trial court abused its much discretion, the appellate court must look at the plaintiff's injuries and the effect of those injuries on that plaintiff. Id. An appellate court should only resort to prior awards for similar injuries when a determination has been made that there was an abuse of discretion. Id.
The record contains extensive evidence regarding Mr. Pertuit's hand injury. The tip of both his index and long fingers has been amputated and he suffers from loss of strength, loss of coordination, temperature intolerance, hypersensitivity, and pain in this hand. There is no question that the hand injury is related to this accident. The relationship between the carpal tunnel injury and the knee injury to this accident is less clear. Dr. Escobar's testified that there was "no way to say the carpal tunnel is 100% related" to the accident. He then explained that the lipoma in the area probably became swollen from the trauma of the accident, and this caused pressure in the carpal tunnel. He admitted on cross examination that it was possible that the carpal tunnel syndrome resulted from some other trauma.
With regards to the knee injury, Dr. Digrado testified that had Mr. Pertuit's knee been injured in the accident, he would have expected him to seek treatment earlier than seven months after the accident. Dr. Digrado explained that during *1108 the surgery he noted extensive damage to Mr. Pertuit's patella that pre-existed the accident, as well as a partially torn meniscus. Dr. Digrado testified that Mr. Pertuit has limited activities due to pain in his knee that is caused by these degenerative changes, not by the injury to the meniscus. A review of all of the medical records submitted do not indicate that Mr. Pertuit complained of pain in his knee prior to the time he sought treatment from Dr. Digrado. Accordingly, we find that plaintiff did not prove that the knee injury was caused by the accident.
While we find the $90,000.00 in general damages awarded to plaintiff to be low, we do not find it so low as to constitute an abuse of discretion. In Hughes v. Bossier Parish School Bd., 32,225 (La.App. 2 Cir. 10/19/99), 745 So.2d 816, the Court affirmed a $50,000.00 general damage award to the plaintiff who sustained a partial amputation of her thumb resulting in a 28% disability of the thumb. The Supreme Court found an award of $100,000.00 for general damages to be appropriate for a plaintiff who suffered a traumatic amputation of his index finger resulting in a 20% impairment of his hand, taking into account the effect the injury had on the plaintiff's family life and finances. LeBlanc v. Stevenson, XXXX-XXXX (La.10/19/00), 770 So.2d 766. Although Mr. Pertuit has had several surgeries to his fingers, he fortunately suffered only 22% impairment to his hand and 12% impairment to his person. The testimony indicates that although he still has pain and decreased use of his right hand, he is still able to carry out many of the functions he performed prior to the accident. Taking into consideration the impact of this injury on Mr. Pertuit, we find no abuse of discretion in the award of $90.000.00 in general damages.

CONCLUSION:
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.