SUSAN M. CHEHARDY, Judge.
 

 |2On appeal, the injured driver’s under-insured motorist insurer seeks review of the judgment in favor of the plaintiffs. For the following reasons, we vacate the judgment in part; amend the judgment, and affirm as amended.
 

 Althea Harrington was involved in two automobile accidents in 2002; one accident on February 14, 2002, and another on March 14, 2002. On February 13, 2003, Mrs. Harrington and her husband, Earl, (hereinafter “the plaintiffs”) filed suit for the February accident against the driver, Dorothy Wilson, and her liability insurer, Allstate Insurance Company.
 

 On March 10, 2003, a second and separate petition for damages was filed by the plaintiffs for the March accident against the driver, Myron Henry and his liability insurer, State Farm Mutual Automobile Insurance Company. On September 29, 2003, the plaintiffs added defendant, Prudential Insurance Company, their underinsured motorist insurance carrier, (hereinafter “Prudential”) for each of the respective accidents.
 

 On October 14, 2003, the defendants, Myron Henry and State Farm, compromised their portion of the claim and were dismissed from the suit, with a preservation of plaintiffs’ rights against Prudential. On April 12, 2007, plaintiffs compromised their claim against Dorothy Wilson and Allstate Insurance Company and again reserved their rights against their underinsured motorist carrier, Prudential.
 
 [1]
 

 On September 12, 2007, trial commenced. At trial, the parties stipulated that Althea and Earl Harrington, in each of the consolidated actions, would limit their recovery to $49,999.99, exclusive of interest and costs, thereby rendering the matter triable by judge pursuant to La. C.C.P. art. 1732. The parties further stipulated that, on the date of each accident, the plaintiffs had underinsured motorist insurance coverage with Prudential Insurance Company in the amount of $100,000.00 for each accident. Finally, the parties stipulated that each driver at fault in the underlying case had liability coverage of $10,000.00 and defendant, Prudential, would be entitled to a credit of $10,000.00 in each case against any recovery plaintiffs may receive in either matter.
 

 At trial, the plaintiffs, Althea and Earl Harrington, testified. The remaining testimony was by deposition. Further, the parties, by joint stipulation, submitted documentary evidence including medical records and bills.
 

 Our review of the record reveals that Althea Harrington was in an automobile accident on February 14, 2002. In that accident, Mrs. Harrington’s vehicle was rear-ended by another vehicle when Mrs. Harrington was on her way to work that morning. She testified that, after that accident, she felt pain in her neck. She went to work as always but, because her pain became more severe, she presented for treatment in the emergency room that afternoon.
 

 According to the medical records for West Jefferson Medical Center, Mrs. Harrington complained of soreness in her neck and lower back. She reported that, on
 
 *34
 
 that date, she had been the seat-belted driver of an automobile that was hit from 14behind while stopped. The emergency-room physician, Dr. Harry Vorhaben, ordered an x-ray of Mrs. Harrington’s cervical spine, which showed no “acute ... abnormality apparent.” Dr. Vorhaben diagnosed the plaintiff with a strain of the neck and lumbar region, prescribed anti-inflammatory medication, and recommended follow-up with her primary care physician.
 

 According to the billing records for Westbank Medical Associates, Mrs. Harrington had an office visit with her internist, Dr. Indumeet Bhatia, on March 9, 2002. Unfortunately, the notes from that visit are not included in the exhibits presented by the parties at trial.
 

 On March 14, 2002, Mrs. Harrington was in a second automobile accident. In that accident, Mrs. Harrington’s vehicle was side-swiped by another vehicle when Mrs. Harrington was on her way to work that morning. She testified that, after that accident, she felt pain in her neck and her ankle. She sought treatment in the emergency room on the next night for “pain and swelling at the ankle,” which the doctor’s notes reflect she sustained when she “fell from a chair and twisted her right ankle” earlier that day. The emergency room physician, Dr. Jack Pomerantz, ordered an x-ray of the ankle, ruled out any fracture, and diagnosed a right ankle sprain.
 

 On March 19, 2002, Mrs. Harrington visited Dr. Bhatia complaining of a sprained ankle from an “automobile accident on 3/14.” Mrs. Harrington reported that she “twisted her foot while trying to get out of the car” when her car was sideswiped. Dr. Bhatia diagnosed an ankle sprain and anxiety resulting from the accident. Dr. Bhatia excused the plaintiff from work for one week. Dr. Bhatia also referred the plaintiff to an orthopedist with Jefferson Orthopedic Clinic, Dr. Thomas Cashio.
 

 | ¡¡That same day, Dr. Cashio saw Mrs. Harrington, who reported that she injured her ankle when another vehicle sideswiped her car. Dr. Cashio observed swelling and tenderness, noted that x-rays of her foot and ankle were “unremarkable,” and fitted her with an ankle support.
 

 On March 26, 2002, Mrs. Harrington returned to Dr. Bhatia complaining of pain in her ankle, neck and back. Dr. Bhatia observed that Mrs. Harrington had restricted range of motion of her neck, and her neck, back and ankle were all “tender.” Dr. Bhatia diagnosed Mrs. Harrington with “cervical & lumbar strain” and “ankle sprain;” continued her medications; and referred her for physical therapy for her neck, back, and ankle. The medical record of that visit indicates that Mrs. Harrington’s first physical therapy session was scheduled for March 28, 2002. Further, Dr. Bhatia’s notes indicate “3-28-02 6 wks. out of work.”
 

 On April 16, 2002, Mrs. Harrington returned to Dr. Bhatia for follow-up. On that date, Mrs. Harrington reported that her ankle and back were better as a result of physical therapy. That day, Dr. Bhatia released Mrs. Harrington to return to work with lifting restrictions.
 
 [2]
 
 The medical records from West Jefferson Medical Center indicate that Mrs. Harrington attended 19 physical therapy sessions in April and May 2002.
 
 [3]
 

 
 *35
 
 On June 4, 2002, Mrs. Harrington returned to Dr. Bhatia for follow-up. Mrs. Harrington reported that she was “feeling better” although her ankle was still diagnosed as a sprain. Dr. Bhatia also noted that Mrs. Harrington was allowed to return to full duty with lifting restriction.
 
 [4]
 
 On August 19, 2002, Mrs. Harrington | ^returned to Dr. Bhatia for her yearly physical and reported “walking two miles every day & feels good.”
 
 [5]
 

 On March 5, 2003, Mrs. Harrington returned to Dr. Bhatia complaining of swelling in her head and neck. Dr. Bhatia ordered a CT scan, with and without contrast, of the neck and chest. On March 7, 2003, Mrs. Harrington underwent a CT scan of the neck, which was negative for abnormalities. On March 10, 2003, Mrs. Harrington underwent a CT scan of the chest, which showed no evidence of abnormality.
 

 On April 28, 2003, Dr. Bhatia referred Mrs. Harrington for an orthopedic evaluation with Dr. Mark Juneau of the Bone and Joint Clinic. On April 29, 2003, Dr. Juneau examined Mrs. Harrington, who complained of continuing pain in her neck and shoulder, which she had experienced since a motor vehicle accident one year earlier. Dr. Juneau ordered and reviewed plain x-rays of the cervical spine and observed “cervical spondylosis primarily [at] C5-6.”
 

 Dr. Juneau ordered an MRI, which was performed on May 6, 2003. According to the radiologist, Mrs. Harrington’s MRI revealed that she had “multilevel degenerative disc disease without impingement on the spinal cord,” with severe degeneration and mild “bilateral foraminal stenosis” at levels C5-6 and severe degeneration with moderate “bilateral foraminal stenosis” at C6-7. On April 28, 2003, Dr. Bhatia also ordered physical therapy but it is unclear from the medical records if Mrs. Harrington received physical therapy pursuant to that order.
 

 Mrs. Harrington returned to Dr. Juneau on May 12, 2003 with continued complaints of “numbness and pain in the left side of her neck [which] radiates down her arm to her shoulder.” He noted that her symptoms had persisted even [7after physical therapy. That day, Dr. Juneau referred Mrs. Harrington for a neurosurgical evaluation because “this has been going on for a year with no relief.”
 

 On June 19, 2003, Dr. John Steck, a neurologist, examined Mrs. Harrington. On that date, Dr. Steck noted that Mrs. Harrington reported that she has had pain in her neck that radiates to her left shoulder and arm since she was in two automobile accidents a little “over a year ago.” When Dr. Steck reviewed the May 2003 MRI, he found it was “a fairly unremarkable study with no evidence of spinal steno-sis, no evidence of nerve root compression and no evidence of disc herniation.” In the end, Dr. Steck noted “probable mild cervical strain” and referred Mrs. Harrington to a physician that specializes in pain management, Dr. Meda Colvin.
 

 On June 24, 2003, Dr. Colvin examined Mrs. Harrington and observed bilateral neck pain with radiation into her shoulders. Dr. Colvin opined that “[t]he patient seems to be in a chronic pain cycle that was initiated by her motor vehicle acci
 
 *36
 
 dents and now she has transitioned into more of a chronic pain with decrease in appetite, mood problems, and sleep problems.” Dr. Colvin also noted that Mrs. Harrington reported three motor vehicle accidents in 2002.
 
 [6]
 
 Dr. Colvin ordered Mrs. Harrington to continue on her previous medications and added antidepressants, to treat her chronic pain syndrome.
 

 On July 22, 2003, Mrs. Harrington returned to Dr. Colvin for a follow-up appointment. Mrs. Harrington reported that she felt much improved because she was sleeping and eating better. Dr. Colvin ordered continued prescription therapy for the chronic pain syndrome.
 

 On September 24, 2003, Mrs. Harrington returned to Dr. Colvin complaining of continued pain after returning to work when the school year began.
 
 [7]
 
 18That day, Mrs. Harrington wrote, on the “Brief Pain Inventory” that she completed on every visit to Dr. Colvin, she wanted to “stop the pain were[sie] my life can been[sic] back to normally[sic].” Upon examination of Mrs. Harrington, Dr. Colvin found “musculo-skeletal tender points in bilateral trapezius as well as bilateral rhomboids,” or tenderness in the muscles of the upper back and shoulder area. Dr. Colvin prescribed occupational therapy for the neck pain and continued prescription therapy, including Lidoderm patches.
 

 On September 29, 2003, Mrs. Harrington began physical therapy as ordered by Dr. Colvin at Crescent City Physical Therapy. At her initial evaluation, Mrs. Harrington reported bilateral neck and shoulder pain, which began “about a year ago” after being in motor vehicle accidents. According to the records, Mrs. Harrington had thirteen physical therapy sessions in the fall of 2003.
 

 On October 31, 2003, Mrs. Harrington returned to Dr. Colvin with reports of “doing much better.” Mrs. Harrington still exhibited “myofascial tenderness in the bilateral trapezii,” or pain in the muscles of her upper back, but her mood was elevated. Throughout this time period, Mrs. Harrington was still taking prescription medications for muscle spasms, pain, and depression associated with her chronic pain syndrome.
 

 Eventually, Mrs. Harrington sought treatment from a second orthopedist, Dr. James Todd because Dr. Juneau was “not doing anything” about her pain. On November 30, 2004, Dr. Todd examined Mrs. Harrington, who reported that, after two motor vehicle accidents in 2002, she had been experiencing radiating back and neck pain for two years. She reported that, during the day, her pain was manageable with medication but was worse at night.
 

 On December 1, 2004, Mrs. Harrington underwent a second MRI, which, according to the radiologist, revealed, “Disc protrusions are noted at the C-3-4, C5-j63 and C6-7 levels effacing the ventral thecal sac ... There is no compression upon the spinal cord ... No appreciable neurocompressive disease, midline, lateral recess or forami-nal stenosis is noted.”
 

 On December 7, 2004, Mrs. Harrington returned to Dr. Todd with complaints of consistent neck pain and lower back pain. Dr. Todd reviewed the most recent MRI film and noted that the “cervical spine demonstrates disc protrusions at C3-4, C5-6 and C6-7 with no neurocompressive
 
 *37
 
 disease.” After reviewing the MRI, Dr. Todd recommended formal physical therapy and continued prescription therapy, with follow-up in four weeks.
 

 On December 9, 2004, Mrs. Harrington began physical therapy at the Bone and Joint Clinic. On her first visit, she reported that she had had back and neck pain for three years since a rear-end collision. Mrs. Harrington also reported that she had been to physical therapy twice since her accident with “no significant long term pain relief.” On that date, the physical therapist noted that Mrs. Harrington reported “aching and sticking” pain in her neck and upper back area that radiated into both arms. The physical therapist also observed tenderness and increased muscle tightness in the “bilateral cervical ... posterior shoulder girdle,” with decreased range of motion in the patient’s neck and upper torso. The physical therapist created a plan of therapy consisting of three visits per week for eight weeks.
 

 On January 13, 2005, Mrs. Harrington returned to Dr. Todd complaining of continued neck and back pain. Mrs. Harrington reported that the physical therapy and medications are not relieving the pain. Dr. Todd continued physical therapy with follow-up in three weeks.
 

 |inOn February 3, 2005,
 
 [8]
 
 the physical therapist discharged Mrs. Harrington from treatment after 19 visits because her insurance did not pay for more than 60 days of physical therapy for one diagnosis. In the discharge summary, the physical therapist noted that the patient had made good progress toward her goals of decreased pain and increased activity.
 

 On February 10, 2005, Mrs. Harrington returned to Dr. Todd reporting improvement. Mrs. Harrington had completed her physical therapy and was taking her medications as needed. Dr. Todd instructed Mrs. Harrington to continue with her home exercise therapy program and follow-up as needed.
 

 On February 24, 2005, however, Mrs. Harrington presented with resumed cervical and lumbar spine pain. Although she did not have limited range of motion, neurological deficiencies, or muscle spasm, Dr. Todd did note that Mrs. Harrington’s MRI “showed an annular tear and small disc bulge at L5-S1.” Dr. Todd opined that the next step in treatment was an epidural steroid injection.
 

 On April 7, 2005, Dr. Jeffrey Borchardt, who treated Mrs. Harrington’s back and neck pain at Meadowcrest Hospital’s Pain Management Clinic, performed a cervical epidural steroid injection procedure on Mrs. Harrington. Dr. Borchardt diagnosed Mrs. Harrington with cervical steno-sis at C6-7 with radicular symptoms. According to his notes, Dr. Borchardt thought that Mrs. Harrington tolerated the procedure well.
 

 On May 2, 2005, Mrs. Harrington presented to Dr. Alexis Waguespack, an orthopedist who specializes in spinal surgery, for evaluation. According to Dr. Wagues-pack’s notes, Mrs. Harrington reported severe neck and arm pain subsequent to “multiple rear-ending accidents.” Mrs. Harrington reported that ^conservative treatment, including physical therapy and epidural steroid injections, did not provide “long term improvement.”
 

 Dr. Waguespack reviewed the plaintiffs May 2003 MRI and the radiologist’s report on that test. Dr. Waguespack found degenerative disc changes at “3-4, 5-6 and
 
 *38
 
 6-7,” with “thecal sac effacement” from a bulging disc at 5-6 and 6-7, which concurred with the radiologist’s impression. Dr. Waguespack explained that “thecal sac effacement” means that the disc bulge “is pushing on the [spinal] cord.” Based on the abnormality on the MRI scan paired with the failed conservative treatment, Dr. Waguespack opined that the bulging disc was causing Mrs. Harrington’s pain and recommended an anterior cervical fusion at C5-6 and C6-7 to eliminate the abnormality. Dr. Waguespack stated that the bulging disc could have been caused by trauma, or by pre-existing arthritis of the neck, i.e., stenosis, exacerbated by trauma.
 

 On May 31, 2005, Dr. Alexis Wagues-pack performed a cervical fusion on Mrs. Harrington, which she tolerated without complications. On June 10, 2005, Mrs. Harrington reported that her pain decreased after surgery. Although she had complaints of pain in September and October of 2005, her pain levels appear to have improved in 2006. Overall, Mrs. Harrington has “improvement from her preoperative complaints” according to Dr. Wagues-pack.
 

 Mrs. Harrington testified that her last employment was May 25, 2005, as a cook for Jefferson Parish Head Start. She had, however, been doing only light cooking and paperwork at her job since 2002 because she could not lift the heavy pots used for most hot meals after her accidents in 2002. Although she has been released back to work, she testified that she has been unsuccessful in finding a job after revealing that she has a previous history of back injury.
 

 112The trial judge took the matter under advisement. On November 28, 2007, after considering the submitted exhibits and post-trial memorandums, the trial judge found Althea Harrington’s total damages to be $263,143.34. In light of the stipulation by plaintiffs to damages of less than $50,000.00 and crediting Prudential $10,000.00 for the liability coverage, the court awarded Althea Harrington $49,999.99 for each accident. The trial judge also awarded Earl Harrington $5,000.00 for his loss of consortium for each accident.
 

 On January 8, 2008, defendant, Prudential Insurance Company, filed a petition for suspensive appeal in the consolidated matter, which was granted by the trial court. On appeal, Prudential raises four assignments of error: first, the trial court was manifestly erroneous when it found that as a result of the two accidents, the plaintiff incurred injuries to her ankle and her neck, which required surgery, and found that plaintiff had sustained $100,000.00 in general damages; second, the trial court was manifestly erroneous when it found medical damages of $115,154.00 when there was insufficient proof of these damages; third, the trial court was manifestly erroneous when it found “lost wages” in the amount of $47,989.34 as there was insufficient proof of these damages; and, fourth, the trial court was manifestly erroneous and committed legal error when it awarded $49,999.99 in damages to Althea Harrington in each case and, in addition, found plaintiffs husband, Earl Harrington, was entitled to $5,000.00 for his loss of consortium in each case, when plaintiffs stipulated the total amount of damages for both plaintiffs was $49,999.99 or less in each case.
 

 In a personal injury action, the plaintiff must prove by a preponderance of the evidence that the claimed injuries resulted from the accident at issue.
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603 (La.2/22/95), 650 So.2d 757. If the medical testimony establishes that it is more probable than not that subsequent | ^injuries were caused by the trauma suffered in the
 
 *39
 
 incident, the burden of proof is satisfied. A presumption of causation will aid a plaintiff in meeting this burden, if before the accident, the injured person was in good health, but, commencing with the accident, the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be reasonable possibility of a causal connection between the accident and the disabling condition.
 
 Housley v. Cerise,
 
 579 So.2d 973 (La.1991). To rebut this presumption, defendant must show that some other particular incident could have caused the injury in question. This is a factual issue, reviewed by an appellate court under the manifest error standard.
 
 Maranto v. Goodyear Tire & Rubber Co., supra.
 

 The factfinder is not precluded from making determinations regarding the credibility of witnesses and respect should be given to those conclusions.
 
 Mosley v. Pennzoil Quaker State,
 
 37,199 (La.App. 2 Cir.7/23/03), 850 So.2d 1100. After weighing and evaluating the medical testimony, the trier of fact may accept or reject the opinion expressed by the medical expert. The factfinder should evaluate the expert testimony by the same rules which are applicable to other witnesses and the trial court is not bound by expert testimony.
 
 Id.
 
 Further, the treating physician’s testimony must be weighed in light of other credible evidence.
 
 Green v. Louisiana Coca Cola Bottling Co., Ltd.,
 
 477 So.2d 904 (La.App. 4th Cir.1985),
 
 writ denied,
 
 478 So.2d 910 (La.1985).
 

 A court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.”
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). In
 
 Mart v. Hill,
 
 505 So.2d 1120, 1127 (La.1987), the supreme court announced a two-part test for the reversal of a factfinder’s determinations: first, the appellate court must find from the record that a ^reasonable factual basis does not exist for the finding of the trial court, and, second, the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The Mari test dictates that a reviewing court must do more than simply review the record for some evidence, which supports or controverts the trial court’s finding.
 
 Id.
 

 Although a reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was reasonable.
 
 See generally, Housley, supra; Sistler v. Liberty Mutual Ins. Co.,
 
 558 So.2d 1106, 1112 (La.1990). “The reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ”
 
 Housley, supra
 
 (quoting
 
 Sistler,
 
 558 So.2d at 1112). In sum, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Canter v. Koehring Co.,
 
 283 So.2d 716 (La.1973).
 

 On appeal, Prudential argues that the trial judge was manifestly erroneous in finding in favor of plaintiffs because there was a “dramatic conflict” between the plaintiffs testimony and the medical history reflected in her medical records. Prudential argues that the records reflect that plaintiff had been fully released to work in June 2002, plaintiff reported that she was “pain-free” in August 2002, plaintiff was
 
 *40
 
 involved in another accident in December 2002, and did not complain of neck and back pain until March 2003. We cannot agree with Prudential’s assertion that such conflicts exist in this record. As we noted above, plaintiff continually sought treatment for pain in her upper back, neck and shoulder from |1sFebruary 2002 until May 31, 2005, when her fusion was performed. In most of the records presented, plaintiff informed the health care professional that her pain began after two motor vehicle accidents in early 2002. After review of the record, we find that the trial judge did not err when he found that Mrs. Harrington’s injuries were causally connected to the motor vehicle accidents at issue. Further, we cannot say that the trial judge was clearly wrong in crediting Mrs. Harrington’s testimony that the onset of her neck, upper back, and shoulder pain was after the February 2002 accident and that the March 2002 accident exacerbated the pain and that pain continued until her cervical fusion in 2005.
 

 Prudential also asserts that Dr. Waguespack testified that plaintiffs back injury that required surgery was not connected to her 2002 automobile accidents. We find that Prudential mischaracterizes Dr. Waguespack’s testimony. Dr. Wag-uespack assented when asked a hypothetical question, during her deposition, which did not accurately reflect the facts of this case. Moreover, our review of the medical records reveals that there is no disagreement among the medical experts that Mrs. Harrington’s 2003 MRI and her 2004 MRI show “no appreciable detrimental change” “in the interval between the two exams,” except further degeneration of the disc at C6-7 “causing more acquired spinal steno-sis.” In sum, the only difference between the two MRIs is degeneration caused by normal arthritis or stenosis. We cannot say, therefore, that the trial judge was clearly wrong in finding that the medical evidence supports the finding that the injuries sustained in the 2002 accidents at issue necessitated the 2005 cervical fusion. Accordingly, we find no merit in defendant’s argument regarding causation.
 

 Prudential also argues that the trial judge erred in awarding $100,000.00 for neck and back injuries that require a cervical fusion. The fact-finder has vast discretion in determining a general damages award.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993). In reviewing an award of general damages, the court of appeal is required to focus on the total award and not on each individual item.
 
 Richard v. Teague,
 
 92-17 (La.App. 3 Cir. 5/4/94), 636 So.2d 1160. An award for damages must be reviewed in a light most favorable to the party who prevailed at trial.
 
 Harvey v. State, Dept. of Transportation and Development,
 
 00-1877 (La.App. 4 Cir. 9/26/01), 799 So.2d 569, 576,
 
 writ denied,
 
 02-0003 (La.3/15/02), 811 So.2d 910. An appellate court may not overturn an award for damages unless it is so out of proportion to the injury complained of that it shocks the conscience.
 
 Id.
 
 at 577. Upon review, we see no abuse of the trial court’s vast discretion in a general damages award of $100,000.00 for neck and back injuries sustained in two accidents that eventually require cervical fusion.
 
 See generally Cooper v. Lacorte,
 
 99-1726 (La.App. 4 Cir. 1/31/01), 775 So.2d 704.
 

 In its second assignment of error, Prudential asserts that the trial judge erroneously awarded medical expenses of $115,154.00 because the record does not contain medical bills for Dr. Waguespack or Meadowcrest Hospital. A plaintiff may recover past medical expenses that he incurs as a result of an injury due to the fault of another. To recover medical expenses, the plaintiff must prove that, more
 
 *41
 
 probably than not, the medical treatment was necessitated by the accident.
 
 Brandao v. Wal-Mart Stores, Inc.,
 
 35,368 (La.App. 2 Cir.12/19/01), 803 So.2d 1039,
 
 writ denied,
 
 02-0493 (La.4/26/02), 814 So.2d 558;
 
 Collins v. Shelter Mutual Insurance Company,
 
 36,528 (La.App. 2 Cir.12/11/02), 833 So.2d 1166.
 

 Here, the trial court awarded past medical expenses in the amount of $115,154.00 for Mrs. Harrington’s medical treatments from February 2002 through May 2005. We agree that Mrs. Harrington demonstrated, through medical testimony, that more probably than not, the subsequent medical treatment was necessitated by the trauma suffered in the accidents.
 

 |17To sustain her burden of proof for an award of past medical expenses, however, Mrs. Harrington should have attached copies of the medical bills for all treatment.
 
 Teague v. Barnes,
 
 519 So.2d 817 (La.App. 5th Cir.1988);
 
 Trinity Universal Ins. Co. v. Normand,
 
 220 So.2d 583 (La.App. 3 Cir.1969). Here, the record includes bills for treatment from Westbank Medical Associates, West Jefferson Medical Center, and two MRIs, totaling $9,625.00. Prudential is correct in pointing out that the record is devoid of proof of the expenses for Dr. Waguespack or Meadowcrest Hospital. Accordingly, we vacate the judgment awarding past medical expenses for Dr. Waguespack and Meadowcrest Hospital. We affirm the trial court’s award for past medical expenses in the amount of $9,625.00.
 

 In its third assignment of error, Prudential argues that the trial court erred in its award of “lost wages.” We disagree. The amount of lost wages do not have to be precisely proven, they must only be shown with “reasonable certainty.”
 
 Pertuit v. State Farm Ins. Co.,
 
 04-176 (La.App. 5 Cir. 6/29/04), 877 So.2d 1101, 1106-1107. A trial court’s award for lost wages is subject to the manifest error standard of review.
 
 Id.
 
 (citing
 
 Ploger v. Reese,
 
 01-2243 (La.App. 4 Cir. 5/22/02), 819 So.2d 1114). In this case, plaintiffs presented evidence from her previous employer, Jefferson Parish Head Start, regarding her salary and benefits. Based on that testimony, the trial judge found that the plaintiff had incurred lost earnings totaling $47,989.34. We see no reason to disturb that finding.
 

 Finally, Prudential asserts, and the plaintiffs agree, that, based on the stipulated limitation of damages, the trial court erred in awarding $10,000.00 to Mr. Harrington for loss of consortium. We, therefore, vacate the trial court’s award of damages to Earl Harrington.
 

 | lsBased on the foregoing, we affirm the trial court’s finding that the plaintiffs injuries were causally connected to her 2002 motor vehicle accidents and affirm the award of $100,000.00 for general damages. Further, we affirm the trial court’s award of $47,989.34 in lost earnings. We must lower the award of medical expenses to $9,625.00. We also vacate the loss of consortium award to Earl Harrington. In conclusion, we amend the total damages award to $157,614.34, and affirm as amended, subject to the credit of $10,000.00 previously paid on each of the accident policies, and further subject to the stipulated amount in controversy: $49,999.99 on each accident. Costs of the appeal are taxed against Prudential Insurance Company.
 

 AFFIRMED IN PART; VACATED IN PART; AMENDED AND AFFIRMED AS AMENDED.
 

 [1]
 

 . On October 20, 2005, the two lawsuits were consolidated for trial.
 

 [2]
 

 . The weight limitation reflected in the doctor's notes for that date is not readable.
 

 [3]
 

 . It is undisputed that Mrs. Harrington did not continue her first course of physical therapy after May 31, 2002 because her insurance
 
 *35
 
 benefits were exhausted and her health insurer denied approval for further therapy.
 

 [4]
 

 . The weight limit listed in the doctor’s notes in illegible.
 

 [5]
 

 . Mrs. Harrington did not work for Jefferson Parish Head Start during the summer months of June and July because the school board’s policy is that all cooks are "furloughed” when school was not in session.
 

 [6]
 

 . At trial, Mrs. Harrington agreed that she had been in a minor automobile accident in December of 2002. She testified that a "guy was trying to get in between another car and he tapped my car in the back.” Mrs. Harrington further testified that that incident did not aggravate her pain.
 

 [7]
 

 . See fn. 5, supra.
 

 [8]
 

 . Although the document contains the date "2-3-04,” we conclude that the date of the patient’s discharge from therapy was more likely February 3, 2005 since her physical therapy with this particular facility did not begin until December 9, 2004.